466 S.E.2d 147

John T. GRIBBEN, et al., Petitioners Below, Appellees,

v.

Col. Thomas KIRK, Superintendent of the Division of Public Safety; Glen B. Gainer, Jr., Auditor of the State of West Virginia; and Larrie Bailey, Treasurer of the State of West Virginia, Respondents Below, Appellants.

No. 22910.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 1995.

Decided Dec. 8, 1995.

490

Barbara H. Allen, Michael C. Allen, Allen & Allen, Charleston, for Appellees.

Donald L. Darling, Senior Deputy Attorney General, Charleston, for Appellants.

Webster J. Arceneaux III, Thomas G. Casto, Lewis, Friedberg, Glasser, Casey and Rollins, Charleston, for amicus curiae William R. Cordle, et al.

CLECKLEY, Justice:

The respondents below and appellants herein, Colonel Thomas Kirk, Superintendent of the Division of Public Safety (DPS) [1]; Glen B. Gainer, Jr., Auditor of the State of West Virginia; and Larrie Bailey, Treasurer of the State of West Virginia, appeal the December 29, 1994, and March 17, 1995, orders of the Circuit Court of Kanawha County. The order dated December 29, 1994, awarded the petitioners below and appellees herein, John T. Gribben, et al., who are 117 present and

---

1. In note 1 of *Peak v. Ratliff*, 185 W.Va. 548, 550, 408 S.E.2d 300, 302 (1991), we stated, in part:

"The Executive Reorganization Act of 1989 redesignated this body, commonly known as the State Police, as the Division of Public Safety and transferred it to the newly created Department of Public Safety, which now administers state military, emergency services, and corrections agencies. *See* W.Va.Code, 5F–1–1, *et seq. See also*, W.Va.Code 15–2–1 *et seq.*" *See also Booth v. Sims*, 193 W.Va. 323, 329 n. 1, 456 S.E.2d 167, 173 n. 1 (1995) (as modified).

former members of the DPS, an aggregate sum of $1,152,678.37 in a mandamus proceeding for unpaid overtime wages. The March 17, 1995, order awarded an additional amount of $4,093.07, for a total sum of $1,156,771.44.[2] Both orders issued writs of mandamus against the Auditor and Treasurer and directed the Auditor to pay the petitioners' claims, together with interest accrued thereon from December 31, 1988, by warrants drawn upon the State Treasury. The orders further directed the Treasurer to endorse the checks drawn upon the warrants.

On appeal, the respondents assert the circuit court erred by ordering a monetary award payable from the general funds of the State Treasury and by awarding interest in a mandamus proceeding. The respondents further assert that if this Court finds interest is appropriate, the circuit court erred in determining the date from which interest should be calculated. By cross-appeal, the petitioners allege the circuit court erred in setting the date interest should begin accruing. Although both parties argue the circuit court erred in setting the date, the parties do not agree upon a date that should be used to calculate the interest due.

## I.

### FACTS AND PROCEDURAL HISTORY

This case represents the third group of present and former State Police Troopers who have filed actions in an attempt to collect unpaid back wages for overtime. In the first action, *Adams, et al. v. Mooney*, Civil Action No. Misc.–77–342, the Honorable Patrick Casey, Judge of the Circuit Court of

Kanawha County, by order entered January 14, 1988, awarded 123 current and former State Police Troopers $484,254.86 in retroactive overtime pay. The second action, *Cordle, et al. v. Kirk*,[3] Civil Action No. 83–P.Misc.622, bears an important relationship to the present case and, therefore, it is necessary for this Court to explain the *Cordle* case in more detail.

*Cordle* was a class action mandamus proceeding filed on October 13, 1983, requesting the circuit court to order the DPS Superintendent to compensate the petitioners for overtime wages. By order dated December 31, 1988, the Honorable Margaret L. Workman, who then was serving as a Judge on the Circuit Court of Kanawha County,[4] found the exemption in W.Va.Code, 15–2–5,[5] of State Police Troopers from the overtime pay provision of the West Virginia Wage and Hour Law, W.Va.Code, 21–5C–1, *et seq.*, "is unconstitutional in that it denies equal protection under the laws as required by the Fourteenth Amendment to the United States Constitution and it violates the prohibition against passage of special legislation found in Article 6, Section 39 of the West Virginia Constitution." (Citation omitted).

The order further provided that under the facts of the case, an award of back wages is not barred under West Virginia's constitutional immunity against suit.[6] Nevertheless, although the petitioners argued the appropriate time period to calculate the award was from July 1, 1978, until June 30, 1985, the circuit court determined the petitioners could not receive retroactive overtime pay pursuant to this Court's decision in *Ables v. Mooney*, 164 W.Va. 19, 264 S.E.2d 424 (1979),

2. The March 17, 1995, order was necessitated by the fact that one of the petitioners inadvertently was excluded from the December 29, 1994, order.

3. This case originally was styled *Cordle v. O'Rourke*. Superintendent Kirk is the successor to former DPS Superintendent John W. O'Rourke.

4. The Honorable Justice Workman currently presides on this Court.

5. W.Va.Code, 15–2–5, has been amended numerous times. In its current form, W.Va.Code, 15–2–5 (1994), provides, in relevant part:

"The Legislature finds and declares that because of the unique duties of members of the division, it is not appropriate to apply the provisions of state wage and hour laws to them. Accordingly, members of the division of public safety are hereby excluded from the provisions of state wage and hour law. The express exclusion hereby enacted shall not be construed as any indication that such members were or were not heretofore covered by said wage and hour law."

6. Our constitutional immunity is set forth in Section 35 of Article VI of the West Virginia Constitution.

prior to October 13, 1983, the date the lawsuit was filed. Instead, the circuit court awarded the petitioners back wages for the time frame from October 13, 1983, "to June 30, 1985, the date Federal Wage and Hour guidelines were adopted by the department." The order did not identify the individuals entitled to the overtime pay or the sum certain amount due.

By "AMENDED JUDGMENT ORDER" filed on August 10, 1992,[7] the Honorable Paul Zakaib, Jr., Judge of the Circuit Court of Kanawha County, identified 392 individuals who were entitled to relief under the December 31, 1988, order. The order calculated the amount of unpaid overtime due each individual, which resulted in an aggregate award of $3,501,501.35, plus costs and fees. The order also issued a writ of mandamus against the DPS "to allocate sufficient funds from its budget to compensate the Petitioners ... plus reasonable costs and fees as approved by the Court." This decision in *Cordle* was not appealed by the State.

The parties agree that the *Cordle* class has experienced a significant amount of difficulty in collecting the award.[8] According to the respondents' brief, the collection efforts of the *Cordle* class were unsuccessful until the 1994 Legislature appropriated $2,000,000 for the 1994–95 fiscal year to pay "Overtime and Wage Court Awards." Of the $2,000,000 appropriated, the *Adams* class received full payment on the principal in the amount of $484,254.86. The *Cordle* class received partial payment in the amount of $1,500,000.[9]

Meanwhile, the third action evolved. On February 10, 1994, another group of State Police Troopers filed a "Motion for Leave to Intervene" in *Cordle*.[10] This group claimed they were coerced and mislead into "opting out" of the *Cordle* litigation. These petitioners were denied the right to intervene; so, on March 1, 1994, they filed this independent action for a writ of mandamus in the Circuit Court of Kanawha County captioned *John T. Gribben, et al. v. Col. Thomas Kirk, Superintendent of the Division of Public Safety, Glen B. Gainer, Jr., Auditor of the State of West Virginia, and Larrie Bailey, Treasurer of the State of West Virginia,* Civil Action No. 94–MISC–160. The petitioners requested that the circuit court issue a writ of mandamus declaring them to be members of the *Cordle* class and enforcing their right to relief pursuant to the *Cordle* judgment. By order dated June 22, 1994, the circuit court granted the writ of mandamus upon the finding that misrepresentations were made and the petitioners were intimidated and coerced into "opting out" of the *Cordle* class. The order declared the *Gribben* petitioners to be members of the *Cordle* class and stated they are entitled to the same relief as the *Cordle* class for unpaid wages from October 13, 1983, to June 30, 1985.

By orders dated December 29, 1994, and March 17, 1995,[11] the circuit court awarded the *Gribben* petitioners the aggregate total principal of $1,156,771.44. The circuit court also awarded interest payable thereon from December 31, 1988, the date the *Cordle* class was deemed entitled to unpaid wages, even though the class members and the amount due to each member was not calculated until the order dated August 10, 1992. Both orders issued writs of mandamus against the State Auditor and Treasurer to pay the peti-

---

7. The original "JUDGMENT ORDER" was entered on March 6, 1992, but was amended due to a clerical error.

8. The petitioners assert that attempts to collect the judgment include:

 "collection in the Court of Claims; proceedings against the Commissioner of Motor Vehicles, the Secretary of the Department of Administration and the Secretary of the Department of Transportation; suggestions directed to the Auditor, the Treasurer, the Division of Motor Vehicles and One Valley Bank; and numerous motions for relief before Judge Zakaib."

9. The respondents further state the remaining $15,745.14 of the $2,000,000 appropriation is in escrow pending the resolution of certain unidentified issues. Of the $1,500,000 paid to the *Cordle* class, $49,339.71 was applied to court-ordered attorney's fees and costs.

10. There originally were 56 petitioners. Subsequently, 51 petitioners were named as intervenors in an "Amended Motion for Leave to Intervene." As previously mentioned, there currently are 117 petitioners in this action.

11. See note 2, *supra,* for an explanation of the March 17, 1995, order.

tioners' claims by warrants drawn on the State Treasury.

## II.

## DISCUSSION

We take up two questions: (1) whether sovereign immunity or separation of powers precludes a court from ordering the petitioners a monetary award payable from the general funds of the State Treasury; and (2) whether the circuit court erred by awarding interest in a mandamus proceeding. For purposes of clarity, we discuss the issues of sovereign immunity and separation of powers separately. The issues presented in this case involve questions of law; therefore, our review is plenary and *de novo. See State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 776, 461 S.E.2d 516, 522 (1995). More specifically, appellate courts review questions involving principles of sovereign immunity *de novo. United States v. Woodley,* 9 F.3d 774, 781 (9th Cir. 1993).

### A.

### *Sovereign Immunity*

The respondents argue that the constitutional immunity provision of Section 35 of Article VI of the West Virginia Constitution bars the petitioners' claim for back overtime pay. Section 35 of Article VI of the West Virginia Constitution provides:

"The State of West Virginia shall never be made defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggestee."

Although this Court, as well as the Legislature, can modify and even abolish the common law immunities applicable to local governments and governmental agents, *e.g., Long v. City of Weirton,* 158 W.Va. 741, 214 S.E.2d 832 (1975), the constitutional grounding of the State's immunity is not judicially revocable. *Kerns v. Bucklew,* 178 W.Va. 68, 72, 357 S.E.2d 750, 754 (1987), *citing Ables v. Mooney,* 164 W.Va. 19, 25 n. 5, 264 S.E.2d 424, 428 n. 5 (1979); *Pittsburgh Elevator Co. v. West Va. Bd. of Regents,* 172 W.Va. 743, 759, 310 S.E.2d 675, 691 (1983) (Miller, J., concurring).[12]

The facial absoluteness of Section 35, however, has not prevented this Court from recognizing several contexts in which litigation may go forward even though the State government—and sometimes, even, the State treasury—could be seriously affected by the outcome of the litigation. Most of these were catalogued in *Pittsburgh Elevator.* The most notable among them is that courts will entertain actions against State officials through the common law writs of mandamus, prohibition, and habeas corpus or through the courts' equitable powers to issue injunctions. In such cases, the "State" is not a defendant; rather, a State official is sued (usually in his or her official capacity) to require performance of a nondiscretionary duty of constitutional or statutory origin or to cease engaging in a course of conduct that violates some constitutional or statutory duty. These judicial powers are recognized

---

**12.** Although sovereign immunity provisions were common in nineteenth century state constitutions, today they are very much the exception rather than the rule. Our survey in *Pittsburgh Elevator* identified only five other states whose constitutions still contain sovereign immunity sections and only two (Alabama and Arkansas) with provisions as rigid as ours. 172 W.Va. at 749 n. 6, 310 S.E.2d at 681 n. 6. It may well be that the strict sovereign immunity imposed by Section 35 has outlived its perceived utility and that West Virginia should join the rest of the country and adopt more flexible legislative resolutions to the issues surrounding governmental liability. Certainly, modern notions of fairness and accountability tend to support doctrines that provide relief to individuals injured by another's conduct and that spread·the risk of loss from such injuries through governmental and insurance programs. The West Virginia Legislature, for example, following our decisions abolishing the common law immunities for local governments, crafted a comprehensive statute designed to accommodate the competing goals of compensating individuals injured by official misconduct and of maintaining the stability of local governments. *See* The Governmental Tort Claims and Insurance Reform Act, W.Va.Code, 29–12A–1, *et seq.* These matters, of course, are for the legislative and executive branches to address and are beyond the power of this Court.

by the jurisdictional grants in Sections 3 and 6 of Article VIII of the West Virginia Constitution and have been so exercised throughout the State's history. *E.g., Oakley v. Gainer,* 175 W.Va. 115, 331 S.E.2d 846 (1985), *overruled on other grounds, Harshbarger v. Gainer,* 184 W.Va. 656, 403 S.E.2d 399 (1991); *Wagoner v. Gainer,* 167 W.Va. 139, 279 S.E.2d 636 (1981); *State ex rel. Blankenship v. McHugh,* 158 W.Va. 986, 217 S.E.2d 49 (1975); *State ex rel. Garnes v. Hanley,* 150 W.Va. 468, 147 S.E.2d 284 (1966). Our cases reflect a desire to ensure the proper performance of official duties, and so long as compliance with a judicial decree does not require the expenditure of money, no potential for conflict with Section 35 is triggered.

■ At times, however, enforcement of other constitutional provisions results in equitable decrees or mandamus orders that can have a serious financial impact. The school and prison cases are illustrative. *See, e.g., Crain v. Bordenkircher,* 176 W.Va. 338, 342 S.E.2d 422 (1986); *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979). This Court enters such territory with great care, fully respectful of the fact that our Constitution places on the Legislature the primary responsibility for raising and allocating State funds. Accordingly, we generally have drawn a demarcating line between orders requiring a State official to spend money for the public good to meet a constitutional standard—such as that which requires provision of a "thorough and efficient" system of public schools or forbids the imposition of cruel and unusual punishment—and ones requiring officials to pay damages to an individual for the past violation of the same constitutional standard. Courts may grant relief in the former cases but not in the latter.[13]

■ Even in a suit for monetary damages against a State official in his or her official capacity, however, we recognize two very limited contexts in which awards have been upheld. One category is represented by *Kerns, supra,* where we granted a writ of mandamus against the respondents, the West Virginia University President and the Board of Regents, to compel payment of damages for employment discrimination on the basis of sex. The respondents argued the damages were barred by constitutional immunity, but we determined the State's immunity was superseded by the Supremacy Clause of the United States Constitution and federal legislation that protects against employment discrimination. In Syllabus Point 1 of *Kerns,* we explained:

"In addition to the overriding effect of the supremacy clause of the *Constitution of the United States* (art. VI, cl. 2) upon contrary state law, federal legislation which is expressly authorized by section 5 of the fourteenth amendment to the *Constitution of the United States* and which implements such amendment will by its own force override contrary state constitutional or statutory law, such as governmental immunity (*W.Va. Const.* art. VI, § 35), which state law provides less protection or relief than provided by the fourteenth amendment and its implementing legislation, such as the Equal Employment Opportunity Act of 1972, as amended, 42 *U.S.C.* §§ 2000e to 2000e–17 (1982)."

Thus, damages may be had against the State despite constitutional immunity if there is federal legislation that applies to the State by virtue of Section 5 of the Fourteenth Amendment.[14]

**13.** Federal law interpreting states' Eleventh Amendment sovereign immunity has drawn the same distinction. *Compare, e.g., Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), *with Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). We also find that federal courts have drawn a distinction between money damages and specific monetary relief noting that "[d]amages are given to the plaintiff to *substitute* for a suffered loss ... specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Maryland Dep't of Human Resources v. Department of HHS,* 763 F.2d

1441, 1446 (D.C.Cir.1985), *quoting* D. Dobbs, *Handbook on the Law of Remedies* 135 (1973); *see also Bowen v. Massachusetts,* 487 U.S. 879, 914, 108 S.Ct. 2722, 2742, 101 L.Ed.2d 749, 776 (1988) (Scalia, J., dissenting) ("Whereas damages compensate the plaintiff for a loss, specific relief prevents or undoes the loss—for example, by ordering return to the plaintiff of the precise property that has been wrongfully taken").

**14.** The parameters of Congress's ability to abrogate a state's Eleventh Amendment right to sovereign immunity is the subject of substantial academic debate. *See* Jonathan R. Siegel, *The*

In the present case, the respondents argue that the petitioners' claim for relief is based on federal and state constitutional grounds and that, while Congress may have the power to authorize suits against the states for constitutional violations and in abrogation of sovereign immunity, it has not done so. In fact, the United States Supreme Court specifically has held that the federal cause of action for remedying violations pursuant to 42 U.S.C. § 1983 does not lie against the states regardless of whether the claim is pursued in federal or state court. The Supreme Court has said it "cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent." *Will v. Michigan Department of State Police,* 491 U.S. 58, 67, 109 S.Ct. 2304, 2310, 105 L.Ed.2d 45, 56 (1989).[15] (Footnote omitted). This argument has great force, but it is not dispositive here because the petitioners do not place reliance upon *Kerns.* Rather, they base their claim on the second context in which we have required State agencies or officials sued in their official capacities to pay monetary awards.

The rationale of the second line of cases recently was invoked in *American Federation of State, County and Municipal Employees, et al. v. CSC of W.Va.,* 176 W.Va. 73, 341 S.E.2d 693 (1985) (per curiam) (*AFSCME II* ), in which two groups of Department of Human Services (DHS) employees brought mandamus actions against the West Virginia Civil Service Commission (CSC) and the DHS. The employees requested this Court, *inter alia,* to issue a writ of mandamus to compel the payment of back pay which we previously addressed in *American Federation of State, County and Munic-*

*ipal Employees v. CSC of W.Va.,* 174 W.Va. 221, 324 S.E.2d 363 (1984) (*AFSCME I* ). The actions by the two groups of employees were consolidated.

One argument made by the respondents in *AFSCME II* was that the action was barred by constitutional immunity. We disagreed and stated:

> "[T]he enactment of W.Va.Code, 29–6–15 [1977] [the relevant civil service provision] and decisions of this Court in which back pay was awarded to public employees wrongfully suspended, demoted, or dismissed, *Spencer v. CSC,* 173 W.Va. 153, 313 S.E.2d 430 (1984); *Drennen v. Department of Health,* 163 W.Va. 185, 255 S.E.2d 548 (1979); *Bell v. Dadisman,* 155 W.Va. 298, 184 S.E.2d 141 (1971); *Harris v. CSC,* 154 W.Va. 705, 178 S.E.2d 842 (1971); *State ex rel. Godby v. Hager,* 154 W.Va. 606, 177 S.E.2d 556 (1970); *State ex rel. Karnes v. Dadisman,* 153 W.Va. 771, 172 S.E.2d 561 (1970); *State ex rel. Clark v. Dadisman,* 154 W.Va. 340, 175 S.E.2d 422 (1970), flow from an implicit recognition that the sovereign immunity doctrine is not implicated in the context of employee relations where the State, acting through its agents, as an employer, has unlawfully withheld all or a part of an employee's salary.... The sovereign immunity doctrine is not a bar to recovery of back pay in the cases now before us." 176 W.Va. at 79, 341 S.E.2d at 699. (One citation omitted).

*See also Paxton v. Crabtree,* 184 W.Va. 237, 400 S.E.2d 245 (1990). Although *AFSCME II* was a per curiam opinion and thus lacked precedential weight, the authorities cited to support the issuance of the writ of mandamus were aptly described,[16] and all but one—

*Hidden Source of Congress's Power to Abrogate State Sovereign Immunity,* 73 Tex.L.Rev. 539 (1995); Note, *Clear Statement Rules, Federalism, and Congressional Regulation of States,* 107 Harv.L.Rev. 1959 (1994). In *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171, 179 (1985), the United States Supreme Court limited Congress's power by holding "that Congress may abrogate the States' constitutionally secured immunity from suit in federal court *only* by making its intention unmistakably clear in the language of the statute. The fundamental nature of the

interests implicated by the Eleventh Amendment dictates this conclusion." (Emphasis added).

**15.** *Compare Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (in their individual capacity, state officials may be sued under § 1983).

**16.** All the cited cases were appeals from the Civil Service Commission except *State ex rel. Godby v. Hager,* 154 W.Va. 606, 177 S.E.2d 556 (1971), which was a mandamus action requiring a county commission to pay back wages to a wrongfully

*Spencer v. CSC,* 173 W.Va. 153, 313 S.E.2d 430 (1984)—were signed opinions of the Court. Indeed, while ruling on appeals by State employees, we said in *Bell v. Dadisman,* 155 W.Va. 298, 300, 184 S.E.2d 141, 143 (1971), that "one wrongfully discharged from a public office is entitled to be paid for the entire time during which he was wrongfully excluded therefrom." In addition, we stated in Syllabus Point 1, in part, of *State ex rel. Clark v. Dadisman,* 154 W.Va. 340, 175 S.E.2d 422 (1970), that a wrongfully dismissed civil servant "is entitled to be reinstated to his former position ... without loss of pay during the period from the date of his dismissal until the date he is reinstated." Moreover, albeit without reference to Section 35, this Court routinely over many decades has issued writs of mandamus requiring the Auditor to compensate public employees for obligations previously incurred by the State. *E.g., State ex rel. Roth v. Sims,* 139 W.Va. 795, 81 S.E.2d 670 (1954) (mandamus order requiring Auditor to honor requisition for employee to receive approved professional training); *State ex rel. W.Va. Bd. of Educ. v. Sims,* 139 W.Va. 802, 81 S.E.2d 665 (1954) (mandamus awarded requiring Auditor to honor a requisition for payment to a professor for an already completed sabbatical leave); *State ex rel. Bd. of Gov. of W.Va. Univ. v. Sims,* 136 W.Va. 789, 68 S.E.2d 489 (1952) (mandamus issued to compel Auditor to issue warrants on requisitions for payment of "prior service allowance" in compensation for past personal services); *State ex rel. Key v. Bond,* 94 W.Va. 255, 118 S.E. 276 (1923) (mandamus awarded in June, 1923, requiring Auditor to execute warrants for salary of petitioner earned in May, 1923).

In such cases as *AFSCME I* and *II, supra,* the Legislature has directed an agency to engage personnel, to employ them on particular terms, and to pay them according to certain criteria. Despite those directions, the agency, acting through the official named as a respondent in the mandamus petition, failed to properly execute its assignment. This failure resulted in an obvious legal debt, and the wronged employee's effort to collect on it does not implicate Section 35 because the Legislature, in effect, already had budgeted for the personnel services and for payment for the services in accordance with its directions. Thus, mandamus lies against the recalcitrant official to perform the nondiscretionary duty created by the statute and pay the employee as the Legislature required.

On the other hand, when a court is asked to impose retroactive liability for noncompliance with a statute where there has not been a legislatively anticipated liability, such as occurred in *Ables v. Mooney,* 164 W.Va. 19, 264 S.E.2d 424 (1979), we have held that Section 35 bars recovery for damages. The question presented in *Ables* was whether the petitioners, active and retired State Police Troopers, were entitled to two-years back overtime wages that accrued during a period in which the DPS Superintendent refused to pay such wages. The DPS Superintendent refused the payment on the basis of *State ex rel. Giles v. Bonar,* 155 W.Va. 421, 184 S.E.2d 639 (1971) (State Police Officers were not employees protected by the Wage and Hour Law), prior to its overruling in *State ex rel. Crosier v. Callaghan,* 160 W.Va. 353, 236 S.E.2d 321 (1977).[17] The

dismissed assessor at a time when we still recognized counties' common law sovereign immunity.

**17.** In *Crosier,* a group of employees who worked as conservation officers for the West Virginia Department of Natural Resources (DNR) brought a mandamus action against the Director of the DNR to compel him to pay for overtime the employees performed. In deciding *Crosier,* we overruled our 1971 decision in *Giles, supra,* where we stated that public officers, specifically State Police Officers, were not protected by the Wage and Hour Law. However, in *Crosier,* we found "nothing in the wage and hour law that excludes 'officers' as such[.]" 160 W.Va. at 358,

236 S.E.2d at 324. Therefore, we held conservation officers are employees covered by the Wage and Hour law and are entitled to mandamus relief.

In *Ables, supra,* we found the Superintendent complied with the Wage and Hour Law from the date *Crosier* was decided until July 1, 1978, when the Legislature amended the wage provisions of the West Virginia Department of Public Safety Reorganization Act, W.Va.Code, 15–2–1, *et seq.* As part of the amendment, W.Va.Code, 15–2–5, excluded State Troopers from coverage under the Wage and Hour Law but provided they were entitled to supplemental pay. Therefore, the issue presented to this Court in *Ables* was limited to "whether the two-year back pay requirement

DPS Superintendent in *Ables* argued, *inter alia*, that the mandamus action brought by the petitioners was a suit against the State and, consequently, was prohibited under Section 35. In addressing the interplay between that section and mandamus actions, we held "that our constitutional immunity provision does not forbid suits against State agencies or officials where the claim is made that they are acting unconstitutionally or beyond their lawful powers, or have failed to perform a nondiscretionary duty imposed on them by law." 164 W.Va. at 29, 264 S.E.2d at 430. Thus, we said in Syllabus Point 2 of *Ables:*

> "In certain instances a suit may be maintained against a State official in his individual capacity, notwithstanding the constitutional immunity provision found in Article VI, Section 35 of the West Virginia Constitution, where the relief sought involves a prospective declaration of the parties' rights. However, where the relief sought involves an attempt to obtain a retroactive monetary recovery against the official based on his prior acts and which recovery is payable from State funds, the constitutional immunity provision bars such relief."

We then concluded the State Police Officers in that case were requesting a retroactive monetary award and, therefore, it was constitutionally barred.

We recognize that *Ables* simply may not be reconcilable with the authorities in *AFSCME II*.[18] Possibly, *Ables* is different because of the unanticipated nature of the liability sought to be imposed there. *But see Clark, supra* (authorizing back pay for agency employees fired after the governor unlaw-

fully terminated agency's civil service status and ordered a mass discharge of its workers) and *Harris v. CSC*, 154 W.Va. 705, 178 S.E.2d 842 (1971). Another possibility is that civil service appeals at least are distinguishable because they represent judicial review of an administrative decision from a tribunal specifically authorized by the Legislature to resolve employee grievances and render awards for back pay and from which both the grieving employee and the employing agency can appeal. We need not decide here, however, whether these or other distinctions have substance and serve to resolve the tension in our cases. Rather, for reasons explained below, we only need recognize that the *AFSCME II* authorities permit courts to entertain mandamus actions brought by public employees against State officials to force the payment of wages for work previously performed or unlawfully denied where the respondent officials fail to comply with legislation that regulates the public employment relationship and that includes an enforcement mechanism. Furthermore, as discussed above, our cases also make clear that mandamus will lie against a State official to adjust prospectively his or her conduct to bring it into compliance with any statutory or constitutional standard.

In this case, the respondents point to the fact that the duty to pay petitioners the disputed amount arises from constitutional and not statutory law. The respondents argue there has been no legislative authorization or contemplation of overtime pay for State police. Indeed, the Legislature specifically provided for an alternative method to

of W.Va.Code, 21–5C–8(d), applies retroactively from the date of *Crosier*." 164 W.Va. at 24, 264 S.E.2d at 427. We distinguished *Ables* from *Crosier* on the grounds that *Crosier* did not consider the constitutional immunity issue, and, therefore, *Ables* was not controlled by our decision in *Crosier.*

**18.** It seems that our analysis regarding sovereign immunity has lead us to both awkward and irreconcilable results. Neither the Bar nor Bench should assume that we are *sub silentio* overruling *Ables*. Despite the celebrated dictum in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), in the law of modern constitutional remedies, not every right comes equipped with a

guarantee of individual remediation for every violation of that right. As this case demonstrates, the doctrine of sovereign immunity provides a formidable limitation on the availability of individual remedies. While it is "[d]ecried as irrational and immoral by some, ... criticized on historic grounds by others, ... [and] recognized by all to have little doctrinal coherence, the doctrine of sovereign immunity nonetheless retained the endorsement of the two institutions that matter—[the West Virginia Supreme Court of Appeals and the West Virginia Legislature]." *Interfirst Bank of Dallas, N.A. v. United States*, 769 F.2d 299, 303 (5th Cir.1985) (citations omitted), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986).

compensate State police. *See* W.Va.Code, 15-2-5, note 5, *supra.* The respondents also contend the circuit court's order is retroactive because it requires them to pay for damages prior to the date of judgment. The petitioners counter-argue by asserting that the source of the duty breached in failing to lawfully compensate public employees for work performed should not affect recovery in *AFSCME II*-type contexts. The petitioners further claim that the circuit court's award here was prospective only because the back pay period it used began to run from the date on which *Cordle* was filed. The petitioners insist that their rights, because the circuit court in this case concluded the petitioners were wrongfully pressured to opt out of the *Cordle* litigation, must be determined as if they had joined in that lawsuit. In addition, the petitioners maintain that mandamus relief should not be limited to the vagaries of how long litigation requires to run its course.[19] Thus, the crucial date for drawing a line between prospective and retroactive relief should be the initiation of the relevant mandamus action and not the date of judgment.

These contentions present difficult issues, which, happily for us, we do not have to decide here. *Cordle* concluded in the December 31, 1988, order, which was incorporated in the final order dated August 10, 1992, that awarding overtime from the date of the initiation of the litigation was prospective relief only. When the appeal time for the 1992 order lapsed, that determination of the circuit court acquired preclusive effect as to any subsequent litigation between parties in privity with the *Cordle* litigants. *See State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995); *Conley v. Spillers*, 171 W.Va. 584, 301 S.E.2d 216 (1983); *Lane v. Williams*, 150 W.Va. 96, 100, 144 S.E.2d 234, 236 (1965). Furthermore, we expressly find that " 'in the earlier litigation the representative of the [State] had authority to represent its interests in a final adjudication of the issue in controversy.' " *Miller*, 194 W.Va. at 13, 459 S.E.2d at 124, *quoting Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 403, 60 S.Ct. 907, 917, 84 L.Ed. 1263, 1276 (1940).[20] The State's failure to appeal that judgment collaterally estops it from relitigating the Section 35 issue in this case. We are in this case, therefore, bound by the *Cordle* ruling.[21]

**19.** The *Cordle* petitioners, for example, had to wait over five years from the date they filed their mandamus action to secure a ruling on their contention that DPS officials were failing to perform a nondiscretionary duty.

**20.** In note 17 of *Miller*, 194 W.Va. at 13, 459 S.E.2d at 124, we stated:

"Of course, the general common law rule is that claim or issue preclusion only works against those who had a fair chance to contest the earlier litigation. This rule in recent decades has been liberalized, and the focus of the preclusion inquiry has in some instances shifted from whether a party itself participated in the prior litigation to whether the party's interests were fully represented in the earlier case, albeit by another."

**21.** We recognize that the parties in this action were not the identical parties in the *Cordle* litigation. Nevertheless, in *Miller, supra,* we suggested that nonparties can be bound to a judgment or ruling where they are in privity with parties to the prior litigation, and the privity concept is fairly elastic under West Virginia law, as elsewhere. Logic suggests that collateral estoppel can achieve its goals only if the preclusive effects occasionally can reach persons who technically were not parties to the original action. The pitfalls of a more mechanical rule are obvious: making party status a *sine qua non* for the opera-

tion of collateral estoppel opens the door to countless varieties of manipulation, including claim-splitting, suits by proxy, and forum shopping.

We also recognized that something more is required for privity between the prior and the present litigants than a common interest. We believe that more has been shown in this case. The theory underlying respondents' iteration of collateral estoppel is that privity exists if a nonparty either substantially controlled a party's involvement in the initial litigation or conversely, permitted a party to the initial litigation to function as its *de facto* representative. 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper *Federal Practice and Procedure* § 4466 at 430 (1981) (arguing that "[p]reclusion is fair so long as the relationship between the nonparty and a party was such that the nonparty had the same practical opportunity to control the course of the proceedings that would be available to a party"); *Restatement (Second) of Judgments*, §§ 40, 41 (endorsing application of claim preclusion to nonparties in specified circumstances). Similarly, a nonparty who comes within the doctrinal framework of virtual representation—a framework in which the party and nonparty share identical interests and that provides for notice and a weighing of equitable considerations—should not be treated differently from a party in this regard.

Accordingly, we hold that Section 35 of Article VI does not bar the petitioners' claim for an award of overtime pay owed to them for the period ensuing from the outset of the *Cordle* lawsuit. For purposes of this case, we are bound to consider that as a grant of prospective relief.

### B.

#### *Separation of Powers*

 Next, the respondents argue that the power to appropriate funds from the State Treasury is a function of the Legislature and the judicial branch is prohibited from exercising its power in this area. The separation of powers among the branches of government is mandated in Section 1 of Article V of the West Virginia Constitution, which provides, in part: "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others[.]" The power to appropriate funds is reserved to the Legislature pursuant to Section 3 of Article X, which states, in part: "No money shall be drawn from the treasury but in pursuance of an appropriation made by law, and on a warrant issued thereon by the auditor; nor shall any money or fund be taken for any other purpose than that for which it has been or may be appropriated, or provided." In light of the foregoing constitutional requirements, the respondents assert the circuit court had no authority to order the Auditor and Treasurer to pay the petitioners' award without the Legislature making such an appropriation in the budget.

Although the respondents' contentions raise serious issues that lie at the core of our constitutional system of government, our holding in Section A, *supra*, permits easy resolution. Under the *AFSCME II* precedents, we deem that a legislative appropriation for personal services, as occurred in the relevant years in question here (1983–85) for State police work, includes a requirement that the funds be expended consistently with prevailing legislative standards. *Cordle* held that those standards included the guarantee of overtime pay under W.Va.Code, 21–5C–1, *et seq.*, guaranteeing overtime pay, and we held in Section A that conclusion is binding on us. Therefore, there has been a legislative appropriation for the petitioners' requested overtime pay, and the petitioners have established their right to be so compensated. As a consequence, the Auditor and the Treasurer can be required to perform their respective nondiscretionary duties and pay from State funds the amount due petitioners.

This is not a novel procedure. We routinely have issued writs of mandamus against the Auditor when he fails to execute the necessary steps to permit payment to individuals of State money to which this Court has found them entitled. *See DePond v. Gainer*, 177 W.Va. 173, 351 S.E.2d 358 (1986) [22] (mandamus awarded requiring Auditor to pay benefits pursuant to judges' retirement system statutes); *Crosier, supra; State ex rel. Bache & Co., Inc. v. Gainer*, 154 W.Va. 499, 177 S.E.2d 10 (1970) (mandamus awarded requiring Auditor to pay for services rendered in connection with road bonds); *State ex rel. Warder v. Gainer*, 153 W.Va. 35, 167 S.E.2d 290 (1969) (mandamus awarded requiring Auditor to pay salary owed member of West Virginia Board of Probation and Parole). As the United States Supreme Court has observed, the Auditor "has the obligation and power to issue warrants for the payment of salaries, and state employees entitled to payment for services may enforce their rights by mandamus against him." *Sims v. United States*, 359 U.S. 108, 113, 79 S.Ct. 641, 645, 3 L.Ed.2d 667, 672 (1959), *citing State ex rel. Bd. of Gov. of W.Va. Univ. v. Sims*, 140 W.Va. 64, 82 S.E.2d 321 (1954); *State ex rel. Bd. of Gov. of W.Va. Univ. v. Sims*, 136 W.Va. 789, 68 S.E.2d 489 (1952); *State ex rel. Bd. of Gov. of W.Va. Univ. v. Sims*, 133 W.Va. 239, 55 S.E.2d 505 (1949).

We most recently reaffirmed this line of cases in *Booth v. Sims*, 193 W.Va. 323, 456

---

The respondents do not contest the petitioners' arguments as to the preclusive effect of *Cordle*, a silence from which we infer a concession as to the validity of those arguments.

**22.** *Overruled on other grounds, Harshbarger v. Gainer*, 184 W.Va. 656, 403 S.E.2d 399 (1991).

**500**

S.E.2d 167 (1995), where we stated in Syllabus Point 14:

> "Because pensions are a lawful debt of the State, the proper remedy for any failure to pay a pension is a mandamus action against the state treasurer and auditor. The funding of any pension program is the legislature's problem—not the state employees' problem—and once the legislature establishes a pension program, it must find a way to pay the pensions to all employees who have substantial reliance interests."

As the pensioners did in *Booth,* the petitioners here have established a lawful debt of the State, and their remedy is a mandamus action against the Treasurer and the Auditor. Thus, the writ shall issue.

## C.

### Interest

In the December 29, 1994, order, the circuit court held the "petitioners are entitled to interest on their respective claims for unpaid overtime from December 31, 1988, the date on which judgment was entered for the class in *Cordle.*" However, the December 31, 1988, *Cordle* order did not set forth a sum certain amount upon which to calculate interest. The sum certain amount for the *Cordle* petitioners was not established until August 10, 1992.

The respondents argue the circuit court erred in setting the date upon which interest should be granted because it provides the petitioners a windfall of interest for a period of time when they were not parties to the action.[23] The respondents also assert that interest cannot be awarded until a sum certain amount is determined, which in the present case did not occur until the order dated December 29, 1994.

The petitioners claim they not only are entitled to interest from December 31, 1988, but they make a cross-assignment of error alleging they are entitled to prejudgment interest back to October 13, 1983, the date

the *Cordle* action was filed. In addition, the *Cordle* petitioners filed an amicus curiae brief in this appeal on the matter of interest. According to the *Cordle* amicus curiae, they also recently requested interest on their awards from October 13, 1983.[24] The *Cordle* amicus curiae state that by order dated August 28, 1995, the circuit court awarded interest on the unpaid balance from December 31, 1988, in a manner consistent with the *Gribben* decision.

In reviewing a circuit court's award of prejudgment interest, we usually apply an abuse of discretion standard. *See generally Perdue v. Doolittle,* 186 W.Va. 681, 414 S.E.2d 442 (1992). Under the abuse of discretion standard, we will not disturb a circuit court's decision unless the circuit court makes a clear error of judgment or exceeds the bounds of permissible choices in the circumstances. However, when the award hinges, in part, on an interpretation of our decisional or statutory law, we review *de novo* that portion of the analysis.

In order to determine whether any award of interest is appropriate, we first must determine whether West Virginia law either expressly allows or expressly forbids the inclusion of interest. Under West Virginia law, interest on a judgment or decree is available pursuant to W.Va.Code, 56–6–31 (1981), which provides, in part: *"Except where it is otherwise provided by law,* every judgment or decree for the payment of money entered by any court of this State shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not[.]"* (Emphasis added). In the absence of an unequivocal prohibition of interest, we must test whether such interest should be included by exclusively applying the language in W.Va.Code, 56–6–31.

The best that we can determine is that the circuit court actually awarded prejudgment interest, but limited such interest to the date of the *Cordle* judgment on December 31,

---

23. For the same reasons we found the petitioners' award was not barred by the doctrine of separation of powers in Section B, *supra,* we find no merit to the respondents' first argument that interest on the award violates the doctrine of separation of powers.

24. Apparently, the issue of interest was not addressed previously in any of the *Cordle* orders.

1988. This date is not the same starting date for the back pay award.[25] Of course, if we find the circuit court's order of prejudgment interest is permissible, there is no need to discuss post-judgment interest. Thus, the first and maybe the dispositive issue is whether the circuit court's judgment was one for "special damages" or "liquidated damages." W.Va.Code, 56–6–31, authorizes prejudgment interest as part of a lost wage award. Specifically, W.Va.Code, 56–6–31, provides that "special damages ... shall bear interest from the date the right to bring the same shall have accrued.... Special damages includes lost wages[.]" As with a lost wage award, prejudgment interest helps to make victims whole. The petitioners maintain the December 31, 1988, *Cordle* order was an award of "special damages."

Under our statute, there is no question that prejudgment interest may be awarded under appropriate circumstances in lost wage cases. The fact that prejudgment interest *can* be awarded, however, only resolves part of our inquiry. We must determine whether under our statutory scheme back pay awards are indeed akin to lost wages.

Although, as the respondents argue, a debt for unpaid wages is not identical to a damage award, the general principles regarding compensation equally are applicable in both cases. In each case, the goal is to place the prevailing parties in the same position as they would have been had they not been deprived of the sum owed them and had benefitted from the full use of the money during the period of deprivation. *Capper v. Gates*, 193 W.Va. 9, 454 S.E.2d 54 (1994); *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied*, — U.S. ——, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994); *Buckhannon–Upshur County Airport Auth. v. R & R Coal Contracting, Inc.*, 186 W.Va. 583, 413 S.E.2d 404 (1991). Given that back pay damages essentially are wages to which the petitioners would have received had not their wages wrongfully been withheld, we believe the prejudgment interest award in this case serves the "compensatory" function and reflects considerations of fairness that we discussed in the cases above. *See Weimer–Godwin v. Board of Educ. of Upshur County*, 179 W.Va. 423, 429, 369 S.E.2d 726, 732 (1988) ("unless prejudgment interest is received, full reimbursement is not accomplished").

■■■■■ The respondents argue that even if prejudgment interest was appropriate, the circuit court erred by choosing December 31, 1988, as the date on which the interest began accruing. In the ordinary case, when prejudgment interest is awarded as "liquidated damages," such interest runs from the date when the damages are of a nature to be certain or capable of being made certain by calculation and when the exact sum certain amount due is made known to the liable party. Liquidated damages, however, are not involved in this case.[26] Rather, it is based upon the "special damages" provision of W.Va.Code, 56–6–31, which includes "lost wages and income." This language is straightforward and mandates by the use of the word "shall" that prejudgment interest be awarded. In cases of "special damages," prejudgment interest must be granted as a matter of right.

■■■■■ Finally, we address the remaining issue regarding interest, that is whether the circuit court erred by only permitting the accrual of interest from the December 31, 1988, order. Prejudgment interest may be calculated within the range of the circuit court's discretion to roughly and fairly compensate the plaintiff. Our review of such a decision is based upon the abuse of discretion

---

25. By making interest and back pay begin on the same date (or making interest begin at a later date than the back pay award), we avoid any additional need to discuss sovereign immunity. Interest is allowed as part of the compensation package so the petitioners can be made whole.

26. Even if liquidated damages were involved, we would not reverse the circuit court's decision. Damages are considered certain or capable of being made certain where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where the dispute centers on the issue of liability giving rise to the damages. This is not a situation in which the amount of damages, as opposed to the determination of liability, depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the petitioners.

standard. Given the tortured history of this case and the unusual facts and circumstances it presents, we cannot find the circuit court abused its discretion. In respect to the starting date for interest to be accruing, this case, not unlike *Cordle,* is an aberration and specifically is limited to the facts.

We find that preserving the award of prejudgment interest properly balances the equities that have guided this opinion and certainly does not overcompensate or undercompensate the petitioners. Accordingly, we hold the circuit court did not abuse its discretion in awarding prejudgment interest to the petitioners.

### III.

### CONCLUSION

In sum, we hold that neither Section 35 of Article VI nor the doctrine of sovereign immunity barred the December 29, 1994, and March 17, 1995, orders of the Circuit Court of Kanawha County issuing writs of mandamus against the respondents requiring them to pay the petitioners' award. We also find the petitioners are entitled to interest on that award from December 31, 1988. Therefore, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

CLECKLEY, Justice, delivered the Opinion of the Court.

MILLER, Retired Justice, sitting by temporary assignment.

ALBRIGHT, Justice, did not participate.

WORKMAN, Justice, deeming herself disqualified, did not participate in the consideration or decision of this case.