490 S.E.2d 787

**Major General Joseph SKAFF, Adjutant General of West Virginia, Appellant,**

**v.**

**K.T. PRIDEMORE, Charles E. Adkins, William S. Arnold, Robert L. Ashmore, Jr., Danny J. Brammer, Russell A. Clay, Donnie L. Craig, Joseph M. Ertl, Joseph L. French, Olaf R. Funfstuck, II, Timothy J. Griffith, Raphael H. Jones, James M. Marcum, Dale R. McKwuen, Bernard A. Settle, Jr., James L. Shaffer, Daniel R. Taylor, Michael A. Withrow and Randall A. Butler, Appellees.**

**No. 23833.**

Supreme Court of Appeals of West Virginia.

Submitted April 29, 1997.

Decided July 15, 1997.

---

Darrell V. McGraw, Jr., Attorney General, Bradford W. Deel, Assistant Attorney General, Charleston, for Appellant.

Joseph C. Cometti, Charleston, for Appellees.

PER CURIAM:

The appellant, the Adjutant General of West Virginia, appeals the March 25, 1996, order of the Circuit Court of Kanawha County which affirmed the final decision of the West Virginia Education and State Employees Grievance Board in a dispute between the Adjutant General and the appellees, who are 19 firefighters assigned to Yeager Airport in Charleston, West Virginia. The grievance involved various employment policies. The circuit court affirmed the decision of the West Virginia Education and State Employees Grievance Board (grievance board) which granted: (1) the retroactive application of a new policy concerning overtime compensation for military leave; (2) ordered the adjutant general to adopt a shift trading policy; (3) ordered the adjutant general to adopt a new policy concerning compensatory time off for holidays; and (4) ordered retroactive application of the new policy regarding compensatory time off for holidays.

For the reasons that follow, we believe the circuit court was correct in finding that the

appellees are entitled to an award of compensation for military leave and holidays. However, we believe that the circuit court erred in making the award retroactive to October 16, 1989, inasmuch as the commencement date of the award should be August 16, 1991. Accordingly, we believe the circuit court decision should be affirmed insofar as it relates to the appellees' entitlement to awards, but should be reversed as it relates to the commencement date of the award. Further, we believe that holiday compensation should be limited to eight hours per holiday after August 3, 1993. Finally, we reverse the circuit court's order that the appellant adopt a shift trading policy.

The underlying dispute began as a grievance brought by numerous firefighters employed by the Adjutant General of the State of West Virginia. The Adjutant General's department is part of the executive branch of state government and is charged with overseeing the military forces of the State.[1] The firefighters are state civilian employees of the Adjutant General, but are required to maintain membership in the National Guard. They are assigned to the Yeager Airport National Guard Facility which is manned 24 hours per day, 365 days per year.

It appears that prior to October 1989, the firefighters assigned to Yeager Airport had working conditions similar to other state employees, such as paid holidays, time and a half compensation for holidays worked, and a 40 hour work week. According to testimony at the grievance board hearing, prior to October 1989, the firefighters worked under a program in which the federal government provided 75% of the funding and the state government provided 25% of the funding. Apparently some of the firefighters at this time worked as county employees while others worked as state employees.

In October 1989, however, a new program was created whereby all of the firefighters became state employees under the command of the adjutant general. It appears that extensive changes were made at that time. Federal funding of the program under which the firefighters worked increased to 100%. The number of full-time firefighters increased to 24. The firefighters began working 12, 18 and 24 hour shifts in a standard shift cycle of 12 days in a pay period of 15 days. The firefighters were compensated at time and a half for any time worked over 114 hours in 15 calender days. Also, the firefighters now received no paid holidays, and were compensated at the regular rate for holidays worked.[2] This program still governs the conditions of employment of the firefighters, and all the issues before this Court arose under this program.

In their original grievance, the firefighters complained of four abuses: (1) they received no days off for official state holidays, and received no additional pay for working these holidays; (2) they accrued vacation and sick leave as if they worked eight hours a day while actually working much longer shifts; (3) overtime missed due to mandatory military duty was not factored into the calcula-

---

1. The office of the Adjutant General is provided for in W.Va.Code § 15–1A–1 et seq. W.Va.Code § 15–1A–1 (1961) states:

 The adjutant general's department shall be a part of the executive branch of the government charged with the organization, administration, operation and training, supply and discipline of the military forces of the State. The adjutant general shall be the executive head of the adjutant general's department, and shall employ such clerical force and assistants as may be required for the fulfillment of his duties.

2. At the Level IV administrative hearing, disputed testimony was offered concerning the reason for the appellees' loss of paid holidays after October 1989. The appellant argued below that the appellees agreed to relinquish paid holidays in exchange for increased salaries, and the appellees recall no such agreement. The Level IV decision states that "there is no documentation of record which establishes such a waiver." There is evidence that the appellees received substantial wage increases after October 1989, but apparently not all that was promised to them.

 The record is not clear on the exact nature of the compensation received by firefighters who worked holidays after October 1989. The Level IV grievance board decision states that the appellees received "compensatory time for any time worked on a holiday," and explains in n. 18:

 That such compensatory time is, and has since October 1989, been allowed is accepted even though the Level III decision and Respondent's Exhibit 2 suggest to the contrary, i.e., that Grievants enjoy no holiday compensation whatsoever. However, even if Grievants are wrong and the Level III decision, etc., are correct, this Decision's outcome is unaffected.

tion of military leave pay;[3] and (4) they were not allowed to trade shifts with one another. At Level III of the grievance procedure, the appellees obtained partial relief, namely, the implementation of new policies on annual leave, sick leave and overtime during military leave. They subsequently initiated a complaint at Level IV on August 16, 1991, seeking retroactive application, to October 16, 1989, of the three new policies; a policy change on shift trades with no retroactive application; and a policy change on holiday compensation, with retroactive application to October 16, 1989.

The Level IV decision stated the following conclusions of law:

1. This Grievance Board is without jurisdiction to address Grievants' request for retroactive application of Respondent's July 1991 annual- and sick-leave policies, in that it is based solely on the Fair Labor Standards Act[.] (citations omitted).

2. Grievants are each entitled to monetary compensation for overtime service they would have performed under regular schedules during work-time for which they were on military leave from October 16, 1989, forward. (citation omitted).

3. Grievants have established that Respondent is in abuse of its discretion in failing to establish and implement a reasonable shift-trading policy.

4. Grievants are each entitled to compensatory time off (or other compensation) for all hours worked on State holidays from October 16, 1989, forward. (citation omitted).

5. Grievants are each entitled to twelve hours' compensatory time off (or other compensation) for all holidays not worked from October 16, 1989, forward. (citation omitted).

6. In the event that a Grievant, from October 16, 1989, forward, worked on a holiday, but not a full twelve hours on the day itself, in addition to the compensation due him (Conc. Law 2, *supra*) he is entitled to additional compensation which when added to the other totals twelve hours' compensation for that holiday.

By order of March 25, 1996, the Circuit Court of Kanawha County affirmed the Level IV decision in its entirety.

■■■■ At the outset, we note that "[e]videntiary findings made at an administrative hearing should not be reversed unless they are clearly wrong." Syllabus Point 1, *Francis O. Day Co. v. Director, D.E.P.*, 191 W.Va. 134, 443 S.E.2d 602 (1994). Where "the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo.*" Syllabus Point 3, in part, *Adkins v. Gatson*, 192 W.Va. 561, 453 S.E.2d 395 (1994). With this in mind, we now examine the issues.

■■■■ First, the appellant asserts that the circuit court erred in ordering retroactive overtime pay for military leave as well as retroactive compensatory time off for holidays because the State is constitutionally immune from an award of retroactive damages payable from the State treasury. The appellees respond that the appellant waived this assignment of error by not raising it below.

■■■■ All parties agree that the appellant did not raise the issue of sovereign immunity either in the administrative hearing or at the circuit court level. "Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered." *Barney v. Auvil*, 195 W.Va. 733, 741, 466 S.E.2d 801, 809 (1995) (citations omitted). It is clear that "the constitutional immunity of the State of West Virginia from suit by Article VI, Section 35 of the Constitution of this

---

**3.** According to the firefighters, their mandatory military duty consists of two weeks a summer and one weekend every month. W.Va.Code § 15–1F–1 (1991) provides in part:

All officers and employees of the state, or subdivisions or municipalities thereof, who shall be members of the national guard or any military reserve unit of the United States armed services, shall be entitled to leave of

absence from their respective offices or employments without loss of pay, status or efficiency rating, on the days during which they shall be engaged in drills, parades or other duty, during business hours ordered by proper authority, or for field training or active service of the state, for a maximum period of thirty working days in any one calender year[.]

State can not be waived by the Legislature or any other instrumentality of the State." *City of Morgantown v. Ducker,* 153 W.Va. 121, 130, 168 S.E.2d 298, 303 (1969). Therefore, the appellant did not waive the defense of sovereign immunity by failing to raise it below. Also, in the past, this Court has looked to the jurisprudence concerning immunity afforded to the states by the Eleventh Amendment to the United States Constitution[4] as a helpful guide in interpreting this state's sovereign immunity clause. *See Ables v. Mooney,* 164 W.Va. 19, 264 S.E.2d 424 (1979). The Supreme Court has stated "that the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court[.]" *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662, 681 (1974). We conclude that in the specific circumstances presented in the instant case, it is appropriate for this Court to address the issue of sovereign immunity even though it was raised for the first time on appeal.

■ As noted above, the appellant contends that the retroactive application of the overtime and holiday compensation policies violates the State's constitutional immunity from suit.[5]

■ In *Ables v. Mooney,* 164 W.Va. 19, 264 S.E.2d 424 (1979), this Court held that the State's sovereign immunity precluded state troopers from receiving a two-year back pay award and stated in Syllabus Point 2:

> In certain instances a suit may be maintained against a State official in his individual capacity, notwithstanding the constitutional immunity provision found in Article VI, Section 35 of the West Virginia Constitution, where the relief sought involves a prospective declaration of the parties' rights. However, where the relief sought involves an attempt to obtain a retroactive monetary recovery against the official based on his prior acts and which recovery is payable from State funds, the constitutional immunity provision bars such relief.

In *Gribben v. Kirk,* 195 W.Va. 488, 466 S.E.2d 147 (1995) this Court discussed at length the issue of sovereign immunity as it relates to an award of back pay to state employees. *Gribben* concerned an appeal by the Superintendent of the State's Division of Public Safety, Auditor, and Treasurer, of two orders of the Circuit Court of Kanawha County awarding present and former employees of the Division of Public Safety an aggregate of $1,156,771.44 in unpaid overtime wages. One of the issues before the Court was "whether sovereign immunity ... precludes a court from ordering the petitioners a monetary award payable from the general funds of the State Treasury[.]" *Gribben,* 195 W.Va. at 493, 466 S.E.2d at 152. This Court recognized the difference between prospective and retroactive relief to the issue of sovereign immunity, stating that "our cases ... make clear that mandamus will lie against a State official to adjust prospectively his or her conduct to bring it into compliance with any statutory or constitutional standard." *Id.,* 195 W.Va. at 497, 466 S.E.2d at 156. There the Court concluded that "[t]he crucial date for drawing a line between prospective and retroactive relief should be the initiation of the relevant mandamus action and not the date of judgment." Syllabus Point 3, *Id.*

■ We believe that the reasoning in *Gribben* is applicable to the present case. Although this is not a mandamus action but rather an appeal from an order of the circuit

---

**4.** The Eleventh Amendment of the United States Constitution states:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States, by citizens of another state, or by citizens or subjects of any foreign state.

**5.** The State's constitutional immunity is set out in Article VI, Section 35 of the Constitution of West Virginia which states:

> The State of West Virginia shall never be made defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggestee.

court, the principles upon which *Gribben* was based are the same. The sovereign immunity doctrine is implicated when retroactive monetary relief against the State is sought, but does not operate to bar an award which is prospective in nature. Applying the *Gribben* standard to these circumstances, we believe that the initiation of the appellees' Level IV grievance board complaint on August 16, 1991 is the crucial date, and conclude that pay awarded from that date is prospective and not barred by sovereign immunity. Applying the principles of *Gribben* dictates that retroactive application of a back pay award to October 16, 1989, would be barred by sovereign immunity. Accordingly, we remand the circuit court's order herein inasmuch as it ordered the retroactive application of overtime military and holiday pay to October 16, 1989, and hold that such relief should date from August 16, 1991.

 The appellees maintain, however, that the doctrine of sovereign immunity is not applicable in the present case because all of the funding used to pay the appellees' salaries comes from the federal government and not State legislative appropriations.

The appellant does not dispute that the ultimate source of the appellees' salaries are funds distributed by the federal government, but notes the nature of the statutory process by which federal funds are collected and dispersed in accordance with their respective purposes. Chapter Four, Article 11 of the W.Va.Code is titled "Legislative Appropriation Of Federal Funds." W.Va.Code § 4–11–3 (1982) states:

Unless contrary to federal law, all federal funds received by a spending unit shall be deposited in and credited to special fund accounts as provided by section two [§ 12–2–2], article two, chapter twelve of this code and shall be available for appropriation by the Legislature as part of the state budget.

W.Va.Code § 12–2–2(b) (1992) states in relevant part:

[A]ll moneys received out of appropriations made by the Congress of the United States

shall be recorded in special fund accounts, apart from the general revenues of the state, in the state treasury and all such moneys shall not be used for any purpose whatsoever unless and until authorized and directed by the Legislature[.]

Further, W.Va.Code § 4–11–5(a) (1985) provides that "[n]o spending unit may make expenditures of any federal funds, whether such funds are advanced prior to expenditure or as reimbursement, unless such expenditures are made pursuant to specific appropriations by the Legislature, except as may be hereinafter provided."[6] It appears from these code sections, therefore, that the federal funds used to pay the appellees are originally deposited in the State treasury and not utilized until appropriated by the Legislature for their specific purpose. In *City of Morgantown v. Ducker, supra,* this Court determined that the State Board of Governors is a State agency protected from suit by sovereign immunity. There the Court explained:

Moneys received and administered by the board of governors are public moneys and such moneys, whether derived from admission fees to athletic contests, from tuition fees, from medical and hospital services, and from appropriations by the Legislature, are public moneys, and when accepted, received or collected by the board must be paid into the State treasury and credited to the proper fund as provided by Section 2, Article 2, Chapter 12, Code, 1931, as amended, and can be withdrawn from the proper fund in the State treasury only upon a warrant issued by the auditor on the treasurer and by the check of the treasurer upon such warrant as provided by Section 1, Article 3, Chapter 12, Code, 1931, as amended.

*Ducker,* 153 W.Va. at 126, 168 S.E.2d at 301 (citation omitted). The Court concluded:

The judgment which the plaintiff would seek in a suit against the board of governors, if satisfied, would be paid from funds in the treasury of the State. The interest of the State would be directly affected and involved in any suit to collect the claim against the board of governors with re-

---

6. W.Va.Code § 12–2–2(b) and § 4–11–6 (1982) contain exceptions and exclusions to the above-

mentioned general provisions, none of which appear relevant to the present case.

spect to funds belonging to and in the custody of the State.

*Ducker*, 153 W.Va. at 131, 168 S.E.2d at 304. Likewise, any back pay awarded to the appellees in this case would be paid from the State treasury and would directly affect the interest of the State. Also, the appellant correctly notes that if the issue in the present case concerns the payment of federal funds and not State funds to satisfy an award of back pay, this Court is without jurisdiction to decide the issue.

■ Next, the appellees assert that federal law supersedes the State Constitution under the circumstances of this case so that sovereign immunity is not applicable. Specifically, the appellees assert the following: their claim is based on the Fair Labor Standards Act; Congress, pursuant to Article 1, Section 8 of the United States Constitution, created the National Guard, membership in which is a condition of their employment; and the program under which they are paid was created by federal legislation. The appellees cite *Kerns v. Bucklew*, 178 W.Va. 68, 357 S.E.2d 750 (1987) to support their contention.

In *Kerns*, the petitioner and the West Virginia Human Rights Commission sought a writ of mandamus compelling the respondents, the President of West Virginia University and the West Virginia Board of Regents, to pay the petitioner damages awarded to her by the West Virginia Human Rights Commission as the result of the Commission's finding of employment discrimination based on the petitioner's sex. The respondents asserted that they were immune from liability by virtue of sovereign immunity. In granting the writ of mandamus, the Court

held that the State's sovereign immunity was superseded by federal constitutional protection against employment discrimination. Specifically, the Court stated in Syllabus Point 1:

> In addition to the overriding effect of the supremacy clause of the *Constitution of the United States* (art. VI, cl.2) upon contrary state law, federal legislation which is expressly authorized by section 5 of the fourteenth amendment to the *Constitution of the United States* and which implements such amendment will by its own force override contrary state constitutional or statutory law, such as governmental immunity (*W.Va. Const.* art. VI, § 35), which state law provides less protection or relief than provided by the fourteenth amendment and its implementing legislation, such as the Equal Employment Opportunity Act of 1972, as amended, 42 *U.S.C.* §§ 2000e to 2000e–17 (1982).

Unlike in *Kerns*, however, here there is no federal legislation superseding the State's sovereign immunity.

First, the appellees state in their brief to this Court that they have "predicated their claim on the Fair Labor Standards Act." A review of the record of this case reveals, however, that at the Level III administrative hearing the appellees relied upon W.Va.Code § 15–1F–1 and cited *Lanehart v. Horner*, 818 F.2d 1574 (Fed.Cir.1987), which concerns a similarly worded federal statute applicable to federal firefighters, in support of their contention on this issue.[7] On the point of holiday compensation, the record appears to indicate that the appellees predicated their claim on an employee handbook distributed by the appellant.[8] In addition, the Level IV

---

7. The Level III Grievance Decision, dated August 12, 1991, states concerning this issue:

> In support of their position on military leave, grievants cited *Lanehart v. Horner*, 818 F.2d 1574 (Fed.Cir.1987) for the proposition that when they take military leave, that time should count toward overtime compensation under the provisions of West Virginia Code 15–1F–1 even though it does *not* count as hours worked for FLSA computations. The wording and purpose of the statutes interpreted in *Lanehart* and W.Va.Code 15–1F–1 are similar enough that *Lanehart* proved very persuasive particularly in light of the fact that there are no cases

construing the West Virginia statute. (emphasis added)

8. The Level IV Grievance Decision, dated June 22, 1993, states concerning the holiday compensation issue:

> In its Brief, at 11, [appellant], citing *Boll v. Fed. Res. Bank*, 365 F.Supp. 637 (E.D.Mo. 1973), *aff'd* 497 F.2d 335 (8th Cir.1974), notes, "The FLSA does not require payment for nonworking time, such as holidays...." While this statement may be true, it also is so that the FLSA does not preclude such payment or other consideration. The FLSA does not give direct guidance in a scenario such as this[.]

administrative decision states that the grievance board "is without jurisdiction to address Grievants' request for retroactive application of Respondent's July 1991 annual- and sick-leave policies, in that it is based solely on the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. *Campbell v. W.Va. Dept. of Commerce*, Docket No. 90–DNR–081 (Aug. 30, 1991)." Finally, in their brief to this Court, the appellees fail to cite any authority whatsoever for the proposition that the Fair Labor Standards Act governs the issues involved here of compensation for military leave and holidays. Based upon all of the above, we believe that the Fair Labor Standards Act is not implicated in the issues raised by the appellees so as to supersede the State' sovereign immunity. Further, we believe the fact that the National Guard was created by Congress or that federal legislation created the program under which the appellees are compensated fails to implicate specific federal legislation, such as the federal statutes prohibiting employment discrimination in *Kerns*, that would operate to supersede the State's sovereign immunity in the present case.

■ Finally, the appellees contend that the application of sovereign immunity in this case violates the appellees' right to due process of law. Specifically, the appellees ask this Court to read Article VI, Section 35 *in pari materia* with the due process clause and hold that the appellees cannot be deprived of their property interests in their employment, as State employees, without due process of law.[9]

■ This Court does not believe that the application of sovereign immunity here violates the appellees' due process of law. While this Court in the past has been critical of the doctrine of sovereign immunity and perceived a conflict between due process rights and sovereign immunity, *see G.M. McCrossin, Inc. v. W.Va. Bd. of Regents*, 177 W.Va. 539, 355 S.E.2d 32 (1987), we find the appellees' argument here to be without merit. Sovereign immunity itself clearly does

not violate due process. "For when state law creates a cause of action, the State is free to define the defenses to that claim, including the defense of immunity, unless, of course, the state rule is in conflict with federal law." *Ferri v. Ackerman*, 444 U.S. 193, 198, 100 S.Ct. 402, 406, 62 L.Ed.2d 355, 360 (1979) (citations omitted). Therefore, we now turn to the other issues presented by the appellant.

■ The second issue for us to determine is whether the grievance board has jurisdiction to order the appellant to implement shift trading policies. The appellant contends that the grievance board exceeded its authority and substituted its management philosophy for that of the appellant in ordering the appellant to adopt a shift trading policy. The appellees respond that the Level IV decision articulated sufficiently compelling reasons for ordering shift trades while the appellant failed to articulate any legitimate reasons for denying shift trades.

The grievance procedure for state employees is provided for in Chapter 29, Article 6A of the W.Va.Code. According to W.Va.Code § 29–6A–1 (1988):

The purpose of this article is to provide a procedure for the equitable and consistent resolution of employment grievances raised by nonelected state employees who are classified under the state civil service system, or employed in any department, other governmental agencies, or by independent boards or commissions created by the Legislature, with the exception of employees of the board of regents, state institutions of higher education, the Legislature, any employees of any constitutional officer unless they are covered under the civil service system, and members of the department of public safety.

"Grievance" is defined by W.Va.Code § 29–6A–2(i) (1988) as:

[A]ny claim by one or more affected state employees alleging a violation, a misapplication or a misinterpretation of the stat-

9. We recognize that broad and sometimes conflicting historical and policy issues are implicated in the jurisprudence of sovereign immunity in this State. *See,* e.g. *Gribben*. Because it is not necessary to our decision to address these matters, we decline to further extend this jurisprudence.

utes, policies, rules, regulations or written agreements under which such employees work, including any violation, misapplication or misinterpretation regarding compensation, hours, terms and conditions of employment, employment status or discrimination; any discriminatory or otherwise aggrieved application of unwritten policies or practices of their employer; any specifically identified incident of harassment or favoritism; or any action, policy or practice constituting a substantial detriment to or interference with effective job performance or the health and safety of the employees.

In the present case the grievance board, in its Level IV decision, concluded that "[g]rievants have established that Respondent is in abuse of its discretion in failing to establish and implement a reasonable shift-trading policy." In its discussion of this issue, the grievance board noted that "[g]rievants themselves concede that [appellant] is not required to permit shift trading", but proceeded to list as reasons for allowing shift trading:

> shift-trading is generally allowed and encouraged in the firefighting industry, that the law "provides for the concept but requires approval by the public agency" [citing 29 U.S.C. § 207(p)(3) ], that [appellant's] firefighters were permitted to engage in shift-trading earlier in time with no significant problems occasioned thereby, that other State employees under the supervision of the Adjutant General, *i.e.,* members of the State Police force, enjoy the benefits of shift-trading, that a policy such as Grievants seek could easily be implemented, and that employee morale accordingly would be greatly enhanced. (citation and footnotes omitted)

■ We find that the grievance board does not have jurisdiction to order the appellant to implement shift trading policies. The jurisdiction of the Education and State Employees Grievance Board is limited to the resolution of grievances as defined by W.Va. Code § 29–6A–2(i) (1988) and W.Va.Code § 18–29–2(a) (1992) so that its "authority extends only to resolving grievances made cognizable by its authorizing legislation." *Vest*

*v. Bd. of Educ.,* 193 W.Va. 222, 225, 455 S.E.2d 781, 784 (1995). The grievance board simply does not have the authority to second guess a state employer's employment policy. The grievance board's discussion of this issue in its final decision and the appellees' brief to this Court fail to cite any rule or regulation that mandates that the appellant adopt a shift trading policy. In the absence of such, the grievance board has no jurisdiction to order the appellant to adopt a shift trading policy, and it exceeded its statutory authority when it did so. This Court agrees with the grievance board that the adoption of a shift trading policy would probably be a good idea. However, as asserted by the appellant, the grievance board, the circuit court and this Court simply do not have the authority to substitute our management philosophy for that of the appellant in this instance. Accordingly, we reverse the circuit court's order mandating that the appellant adopt a shift trading policy.

■ The final issue is whether the circuit court erred in ordering the appellant to pay compensatory time off for holidays.

The grievance board's Level IV decision concluded that the appellees are each entitled to compensatory time off (or other compensation) for all hours worked on state holidays, and compensatory time off of twelve hours for all holidays not worked. The appellant essentially argues that this conclusion is erroneous for three reasons. First, the appellees are not part of the classified service, but instead are classified-exempt employees. Since the rules on which the grievance board relied, 143 C.S.R. § 1–15 (1991) apply only to classified employees, the appellees are specifically excluded. Second, the appellant notes that even if these rules did apply to the appellees, 143 C.S.R. § 1–15.7 (1991) states that when an employee is required to work in excess of his prescribed working hours or on holidays, the compensation shall be made in accordance with the Fair Labor Standards Act. The appellant contends that cases interpreting the Fair Labor Standards Act accord no special status to holidays. Finally, the appellant asserts that the grievance board's decision is erroneous even if the appellees are entitled to com-

pensatory time off for holidays on which they are required to work because, assuming arguendo that the Division of Personnel Regulations apply in this case, 143 C.S.R. § 1–15.1(b) (1995) provides that "[t]he total payment of paid time off for holidays shall not exceed eight hours per full day holiday." The appellant concludes that, regardless of the number of hours the appellees actually work on a holiday, they are not entitled to more than eight hours compensatory time off.

As noted above, it appears from the record that prior to October 1989, the appellees, pursuant to an employment handbook, enjoyed paid holidays and time and a half compensation for holidays worked.[10] After October 1989, it appears that the appellees received only "compensatory time for any time worked on a holiday," but no compensation at all if they did not work on the holiday.[11] In their grievance, the appellants asserted a right to payment for at least twelve hours for each recognized state holiday, and normal pay plus a paid "replacement holiday" for hours actually worked on a holiday. The Level IV grievance board decision granting the relief requested is essentially based on an employment handbook distributed by the appellant.

The employment handbook states in Section 1–1 that "[t]he employees of this Department are not members of the West Virginia Civil Service System; however, the Rules and Regulations established by the Civil Service Commission are used as guidelines to establish policy pertaining to State employees, such as leave, salary and retirement."

The appellees filed their Level IV complaint with the grievance board on August 16, 1991, and the Civil Service Commission rules in effect at that time are applicable. 143 C.S.R. § 1–16.1, which became effective on May 16, 1991 is applicable to classified employees and lists the official state holidays and the state policy concerning these holidays in language almost identical to the appellant's employment handbook. Further, 143 C.S.R. § 1–16.1 states in relevant part:

It is recognized that some agencies must modify holiday schedules to accommodate around-the-clock shifts or other special needs. Each agency should notify employees in advance of altered holiday work schedules and should schedule altered holidays as close as possible to normal holidays.

143 C.S.R. § 1–15.1(b) which became effective on August 3, 1993 and superseded the prior rules, adds to the above provision that "[t]he total payment of paid time off for holidays shall not exceed eight hours per full day holiday." Finally, 143 C.S.R. § 1–16.7 (1991) states:

An appointing authority or his designated representative may require an employee to work in excess of the prescribed working hours or on holidays when the such work is deemed necessary to the public interest. Compensation shall be made in accordance with the Fair Labor Standards Act of 1986.[12]

Although the appellant asserted below, and the grievance board did not dispute, that the Fair Labor Standards Act does not re-

---

**10.** The appellees' employment handbook at section 2–1 provides:

 a. Official holidays are:
New Year's Day (January 1)
Martin Luther King Day (January 15)
Lincoln's Birthday (February 12)
Washington's Birthday (Third Monday in February)
Memorial Day (Last Monday in May)
West Virginia Day (June 20)
Independence Day (July 4)
Labor Day (First Monday in September)
Columbus Day (Second Monday in October)
Veterans Day (November 11)
Thanksgiving Day (Fourth Tuesday in November)
Christmas Day (December 25)

Any day on which an election (Primary or General) is held throughout the State
Other days as may be proclaimed by the President or Governor as official holidays

At the December 23, 1991 Level IV grievance board hearing there was testimony that prior to October, 1989, the firefighters received time and a half compensation for working state holidays. It appears, also, that the firefighters who did not work on the above listed holidays received their regular compensation for these days.

**11.** *See* note 2.

**12.** This regulation apparently refers to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.*

ards." Such reasoning ignores the fact that a jury would be much less apt to creatively evade the statutory language than this Court. Such reasoning disregards W.Va. Code § 23–4–2(c)(2)(iii)(B), concerning the appropriateness of summary judgment when the five elements of deliberate intention are not present. Such reasoning frustrates judicial economy by mandating the time and expense of a trial when, plainly, one is not merited.

Similarly, this Court's decision in *Skidmore* guarantees that another meritless action, rightfully dismissed by the circuit court, will now go to trial. I dissent because I believe that the appellants failed to produce sufficient evidence to establish that the appellee acted with deliberate intention to defeat the appellee's motion for a directed verdict.

A lack of security measures in a convenience store in rural West Virginia, which has the lowest crime rate in the nation, simply does not constitute a specific unsafe working condition with a high degree of risk and a strong probability of serious injury or death. This is especially so in light of the apparent lack of evidence that the convenience store has a history of being robbed. The evidence presented by the appellant below, while not proving deliberate intention, does show two things. First, it shows that the appellee may have violated the standard of care for security measures in the convenience store industry, which might make him guilty of mere negligence. Second, the evidence shows that a plaintiff can get anyone to testify that the five elements constituting deliberate intention is present in any particular set of circumstances. In the majority opinion, the Court manages to take evidence of poor security and turn it into full-blown deliberate intention, and expects that a reasonable jury may be able to do the same. The Court forgets, however, that the average jury may not be as skilled at bootstrapping.

Perhaps the majority here is motivated by the brutal set of facts in this case and disturbed that an innocent pregnant woman could be so victimized by violent crime and not receive compensation. I am likewise troubled and very sympathetic to the sad fact that crimes such as this one happen thousands of times a year and the victims receive no compensation. The old saw that "hard cases make bad law" is still true, and the Court's effort to fit the circumstances of this case into the deliberate intention exception is a perfect example.

I suspect that the majority is also motivated here by its historical antagonism to the immunity provision of the Workers' Compensation Act. This Court, like most other courts, seems to be plagued by the notion that somewhere, someone actually enjoys immunity to tort liability. Nevertheless, this immunity was created by the Legislature and is an integral part of this state's carefully crafted workers' compensation system, therefore, this Court should learn to live with it. Because I believe that in the above-mentioned opinions the Court improperly invokes the deliberate intention exception, I respectfully dissent.