No. 23-ICA-127 – *Brian Cunningham, in his capacity as Director of the Public Employees Insurance Agency and Mark D. Scott, Geoff S. Christian, Amanda D. Meadows, Jared Robertson, Damita Johnson, Jason Myers, Michael Cook, William Milam, and Michael T. Smith, in their capacities as Members of the Public Employees Insurance Agency Finance Board v. Air Evac EMS, Inc.,*

**FILED**

**July 3, 2024**

released at 3:00 p.m.
ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

and

No. 23-ICA-135 – *Air Evac EMS, Inc., v. Brian Cunningham, in his capacity as Director of the Public Employees Insurance Agency and Mark D. Scott, Geoff S. Christian, Amanda D. Meadows, Jared Robertson, Damita Johnson, Jason Myers, Michael Cook, William Milam, and Michael T. Smith, in their capacities as Members of the Public Employees Insurance Agency Finance Board*

SCARR, C.J., dissenting:

I respectfully dissent from the majority's decision to reverse the circuit court's December 16, 2022, Final Order Granting, in Part and Denying, in Part Air Evac EMS, Inc.'s Petition for Appeal. This case stems from the aftereffects of extensive federal litigation, in which the Fourth Circuit Court of Appeals held that the federal Airline Deregulation Act ("ADA") preempted state statutes which capped the Public Employees Insurance Agency ("PEIA")'s reimbursement rates for air ambulance providers to either the Medicare Rural Rate or the annual cost of an air ambulance provider's membership program, while making "balance-billing" (wherein a provider bills the insured for the remaining balance after being partially reimbursed by an insurer) a criminal offense. *See Air Evac EMS, Inc. v. Cheatham* (*Cheatham I*), 260 F. Supp. 3d 628, 633 (S.D.W. Va. 2017); *Air Evac EMS, Inc. v. Cheatham* (*Cheatham II*), No. 2:16-cv-05224, 2017 WL

1

4765966, at *1 (S.D.W. Va. Oct. 20, 2017), *aff'd*, 910 F.3d 751 (4th Cir. 2018); *Air Evac EMS, Inc. v. Cheatham* (*Cheatham III*), 910 F.3d 751, 759 (4th Cir. 2018).

Air Evac EMS, Inc. ("Air Evac") is an air ambulance provider who operates in West Virginia, and was the party who sought the injunction of the rate-capping statutes in the *Cheatham* litigation. PEIA is an insurance company created by the State of West Virginia for its employees as an alternative to using a private insurance company. By virtue of operating in West Virginia, Air Evac was legally required to do business with PEIA by providing its services to PEIA's insureds. *See* W. Va. Code R. § 64-48-4.15 (2022). As was noted by the district court, "Air Evac must accept patients without regard to insurance coverage or ability to pay." *Cheatham I*, 260 F. Supp. 3d at 633. Indeed, "West Virginia law forbids Air Evac from refusing service to any patient, regardless of insured status. In fact, because Air Evac is most often called upon to provide transportation in medical emergencies, the air ambulance provider does not know a patient's insured status until after the emergency transport has concluded." *Cheatham II*, 2017 WL 4765966, at *1 (citations omitted). After the federal district court enjoined enforcement of the rate-capping statutes on October 20, 2017, PEIA continued to pay Air Evac the Medicare Rural Rate, which is the same amount as it had paid under the enjoined statutes.

After *Cheatham III*, Air Evac sought additional reimbursement beyond the Medicare Rural Rate for the services it provided during the *Cheatham* litigation, which it had accepted as partial payment. Specifically, Air Evac sought the remaining balance of

2

$4,018,046 for the 115 transports it had provided to PEIA members between June 9, 2016, the initiation of the *Cheatham* litigation, and the June 4, 2019, amending of West Virginia Code § 5-16-8a to allow air ambulance service providers to balance bill insureds. PEIA has consistently refused to pay Air Evac anything more than what it owed under the enjoined rate-capping statutes. As a result, Air Evac has only received $754,988.00 of the $4,773,034.00 "full billed" charges. PEIA even refuses Air Evac's demand to hold a hearing regarding the disputed charges, contending that the matter is not a "contested case." This refusal to hold a hearing caused Air Evac to file its December 13, 2019, Petition for Appeal in the circuit court, seeking a court order compelling PEIA to hold an administrative hearing pursuant to their own Rules of Procedure for Contested Case Hearings and Declaratory Rulings ("contested case rules"). *See* W. Va. Code R. § 151-3-4 (1987). With constitutional rights hanging in the balance, the majority now orders the dismissal of Air Evac's claim, on the grounds that PEIA, an insurance company created to ensure compensation of healthcare services provided to our state employees, has sovereign immunity against the claims of health care providers who were forced to provide services for its insureds. Although the purpose of sovereign immunity is to protect the public purse, the desire to protect the government goes too far here. The majority fails to properly appreciate and adequately consider the unique circumstances at play. By allowing this overly broad construction of our sovereign immunity doctrine, the majority has enabled PEIA to essentially nullify the result of the *Cheatham* cases. In doing so, the majority improperly places the state's sovereign right to immunity from suit above our people's fundamental due process rights.

3

The basis of our sovereign immunity is found within Article VI, § 35 of the West Virginia Constitution, which provides that: "The state of West Virginia shall never be made defendant in any court of law or equity . . . ." W. VA. CONST. art. VI, § 35. As correctly noted by the majority, sovereign immunity confers a great deal of protection from suit upon the state and its agencies. *Mellon-Stuart Co. v. Hall*, 178 W. Va. 291, 296, 359 S.E.2d 124, 129 (1987) ("This constitutional grant of immunity is absolute and, as we have consistently held, cannot be waived by the legislature or any other instrumentality of the State."). The primary purpose of sovereign immunity is to prevent the diversion of state monies from legislatively appropriated purposes. Thus, our rule is that generally, when monetary relief is sought against the state treasury for which a proper legislative appropriation has not been made, sovereign immunity raises a bar to suit. *Id.*

However, our courts have a long history of wisely tempering the harsh language of Article VI, § 35 so that the State of West Virginia's right to be free from suit does not displace the fundamental rights of its citizens. *See Tompkins v. Kanawha Bd.*, 19 W. Va. 257, 264 (1881) ("There is no creature of the State above the law and irresponsible. If this were so, the corporation might deny to certain individuals all benefits to be conferred by the corporation, and yet it being sovereign or representing sovereignty it could not be sued."). Less than two decades after West Virginia's formation, the *Tompkins* Court noted the inherent problems that an overly rigid application of sovereign immunity would create when it held that the doctrine was inapplicable to a state-owned corporation, stating that to

4

hold otherwise would create "a legalized despot trespassing upon the rights of the citizens, who would be powerless to protect themselves." *Id.* at 263.

"The concept that '[t]here is no creature of the State above the law and irresponsible' expressed in *Tompkins* finds its foundation in article III of the West Virginia Constitution, commonly known as our 'Bill of Rights.'" *Pittsburgh Elevator Co. v. W. Virginia Bd. of Regents*, 172 W. Va. 743, 750, 310 S.E.2d 675, 682 (1983). There are several due process rights enumerated in the West Virginia Constitution's Bill of Rights ("WVCBR") that are at odds with a broad construction of our sovereign immunity doctrine. *See id*. Indeed, "[t]he philosophical basis of our pluralistic society is crippled when the government's power is found to be so absolute that it cannot be made to answer for the wrongs committed in its name." *G.M. McCrossin, Inc. v. W. Virginia Bd. of Regents*, 177 W. Va. 539, 541, 355 S.E.2d 32, 34 (1987). Section 9 of article III of the West Virginia Constitution provides that:

> Private property shall not be taken or damaged for public use, without just compensation ... and when private property shall be taken, or damaged for public use ... the compensation to the owner shall be ascertained in such manner, as may be prescribed by general law; *Provided*, That when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders.

Section 10 of article III provides that: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers[;]" and § 17 of article III provides: "The courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and

5

justice shall be administered without sale, denial or delay." *Id.* art. III, §§ 10, 17. These state due process rights explicitly guaranteeing the right to compensation, including a right to have such compensation ascertained by a jury in matters involving a public taking, plainly conflict with a doctrine that provides unwavering immunity to the state. Our state constitution clearly contemplates that every person who suffers damages shall have recourse through the courts to seek redress, and "[t]he fact that the wrongdoer is an instrumentality of state government should not eviscerate these constitutional rights, inasmuch as the Bill of Rights contained in article III is designed to protect people from government." *Pittsburgh Elevator Co.*, 172 W. Va. at 754, 310 S.E.2d at 686. In addition to conflicting with our state constitution's due process rights, a broad view of our sovereign immunity doctrine also sits uneasily with the federal constitution's due process rights, that no person shall be deprived of their property without due process of law, and that no property shall be taken for public use without just compensation. *See G.M. McCrossin, Inc.*, 177 W. Va. at 542, 355 S.E.2d at 35; U.S. CONST. amend. XIV, § 1. The people's due process rights are most fundamental to our very conception of government, *see* Rodney L. Mott, *Due Process of Law* 589 (2d. ed. 1973), and plainly conflict with a doctrine holding that no recovery can be had against the state nor its agents for any potential wrongdoing.

"Whenever possible, apparently conflicting portions of a constitution will be read so as to reconcile and harmonize them. We have, however, recognized that, if it is necessary to maintain the rights of a citizen under article III, those rights will be treated as an exception to the inhibition on suing the state government." *G.M. McCrossin, Inc.*, 177

6

W. Va. at 542, 355 S.E.2d at 35 (citations omitted). Accordingly, our courts have wisely tempered Article VI, § 35's apparent bar by carving out several exceptions to the otherwise harsh sovereign immunity doctrine. *See id.* at 542-43, 355 S.E.2d at 35-36. For example, constitutional concerns motivated the allowance of an aggrieved person to achieve, through a writ of mandamus, a similar result to a suit for damages against the state. *See State ex rel. Henson v. W. Virginia Dep't of Transp., Div. of Highways*, 203 W. Va. 229, 232, 506 S.E.2d 825, 828 (1998); *State ex rel. Rhodes v. W. Virginia Dep't of Highways*, 155 W. Va. 735, 738, 187 S.E.2d 218, 220 (1972); Syl. Pts. 1-2, *State ex rel. Phoenix Ins. Co. v. Ritchie*, 154 W. Va. 306, 175 S.E.2d 428 (1970).[1] In addition to such equitable causes of action, our precedent also allows suits for damages when the state is acting as a proprietor, *Ward v. Cnty. Ct. of Raleigh Cnty.*, 141 W. Va. 730, 739-40, 93 S.E.2d 44, 49 (1956); when an agency is acting as a quasi-public corporation, *Hope Nat. Gas Co. v. W. Va. Tpk. Comm'n*, 143 W. Va. 913, 930, 105 S.E.2d 630, 639-40 (1958); and when the state has a "moral obligation" to pay damages. Syl., *State ex rel. Davis Tr. Co. v. Sims*, 130 W. Va. 623, 46 S.E.2d 90 (1947). It is noteworthy that when analyzing whether a governmental entity can be sued as a quasi-public corporation, the court pays significant attention to the source of funds when determining whether the suit for damages is truly against the public purse. *See Hope Nat. Gas Co.*, 143 W. Va. at 929-30, 105 S.E.2d at 639-40. Another sovereign immunity exception that makes manifestly clear the importance of the public purse is the

---

[1] Sovereign immunity does not typically bar equitable actions against state officers or agents, as they are not against the state itself, and as such suits do not directly seek monetary damages, they do not typically implicate the public purse. *See Pittsburgh Elevator Co.*, 172 W. Va. at 753-54, 310 S.E.2d at 685-86.

allowance of suits for damages against the state up to the limit of any liability insurance coverage it may have. Syl. Pt. 2, *Pittsburgh Elevator Co.*, 172 W. Va. 743, 310 S.E.2d 675. A survey of those numerous exceptions to our sovereign immunity doctrine reveals two major throughlines: whether the suit would result in a recovery of damages from the public purse, and the danger of sovereign immunity obviating the people's constitutional due process rights.

Applying these principles to the case at hand, it is evident that there are unique circumstances at play here that attenuate the dangers to the public purse and accentuate the danger of obviating Air Evac's due process rights by applying sovereign immunity's bar to its claims. Before this litigation, Air Evac had prevailed in the federal *Cheatham* litigation and was attempting to negotiate with PEIA for the remaining balance of the partial payments made at the rate-capped reimbursement rate for services provided to PEIA members from June 9, 2016, to June 4, 2019. Although the federal district court enjoined enforcement of the rate-capping statutes on October 20, 2017, PEIA continued to only pay the same Medicare Rural Rate as prescribed by the rate-capping statutes. As Air Evac was legally required to continue to provide its services to PEIA insureds both during and after the *Cheatham* litigation, it had no choice but to accept the PEIA's partial payments. *See* W. Va. Code R. § 64-48-4.15. Then, as Air Evac attempted to exercise its due process rights to an administrative hearing, it was met with a rigid refusal to even hold a hearing regarding whether PEIA owed any additional payment. These actions caused Air Evac to file its Petition for Appeal in the circuit court, seeking an order mandating that

8

PEIA hold a hearing regarding the matter pursuant to PEIA's contested case rules. *See* W. Va. Code R. § 151-3-4.

Regarding the danger that Air Evac's claims may pose to the public purse, there are attenuating factors that mitigate any such danger. It must be noted that Air Evac is only seeking full reimbursement for a period of limited duration, so there is no risk of an indeterminate amount of future payments depleting the state's coffers. In addition, the nature of the funds at issue and for what they would be awarded must be considered. PEIA is an insurance company created by the State of West Virginia to serve as an insurance provider for its employees. *See* W. Va. Code § 5-16-1 (2024). In this capacity, PEIA receives premiums from its insureds, and these premiums make up the great majority of its revenue; state appropriations have been well under ten percent of PEIA's yearly revenue since 2014.[2]

---

[2] *See* Ernst & Young LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2023 AND 2022 WITH REPORT OF INDEPENDENT AUDITORS 17 (2023), https://peia.wv.gov/Forms-Downloads/Documents/financial_reports/independent%20auditors%20reports/peia/PEIA_Basic_Financial_Statements_Required%20Supplementary_Information_Other_Financial_Information_Fiscal_Years_2022-2023.pdf; Ernst & Young LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2022 AND 2021 WITH REPORT OF INDEPENDENT AUDITORS 15 (2022), https://peia.wv.gov/financial_reports/Documents/2208-4088006_West%20Virginia%20Public%20Employees%20Insurance%20Agency_22-21_FINAL.pdf; Ernst & Young LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2021 AND 2020 WITH REPORT OF INDEPENDENT AUDITORS 12 (2021),

Considering the small percentage of PEIA revenue coming from the state, it must be noted that such funds are appropriated for the purpose of paying for PEIA's expenses. Predictably enough, PEIA's revenue is mostly spent on paying for the claims of its insureds, and this type of expenditure is exactly what was intended by the legislature. Indeed, the entire *raison d'etre* of an insurance provider is to use the pooled premiums to

---

https://peia.wv.gov/financial_reports/Documents/WVPEIA%20FS%2021-20_Final.pdf; Dixon Hughes Goodman LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2020 AND 2019 11 (2020), https://peia.wv.gov/financial_reports/Documents/PEIA%20Financial%20Statements%20 6.30.20.pdf; Dixon Hughes Goodman LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2019 AND 2018 11 (2019), https://peia.wv.gov/financial_reports/Documents/PEIA%20Financial%20Statements%20 6.30.19.pdf; Dixon Hughes Goodman LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2018 AND 2017 11 (2018), https://peia.wv.gov/financial_reports/Documents/PEIA%20FS%206.30.18-final.pdf; Dixon Hughes Goodman LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2017AND 2016 11 (2017), https://peia.wv.gov/Forms-Downloads/Documents/financial_reports/PEIA%20FS%206.30.17.pdf; Dixon Hughes Goodman LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2016 AND 2015 11 (2016), https://peia.wv.gov/financial_reports/Documents/PEIA%20FS%206.30.16.pdf; Dixon Hughes Goodman LLP, WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE AGENCY: FINANCIAL STATEMENTS, REQUIRED SUPPLEMENTARY INFORMATION, AND OTHER SUPPLEMENTARY INFORMATION YEARS ENDED JUNE 30, 2015 AND 2014 11 (2015), https://peia.wv.gov/Forms-Downloads/Documents/financial_reports/independent%20auditors%20reports/peia/Finan cial-Statements-Fiscal-Years-2014-2015.pdf.

pay those covered expenses too great for any one of its insureds to bear. The majority's usage of sovereign immunity is misapplied here; that doctrine is meant to protect state monies from being *diverted* from their legislatively appropriated purposes, not to prevent the spending of any state monies whatsoever. *See Mellon-Stuart Co.*, 178 W. Va. at 296, 359 S.E.2d at 129.

Our law explicitly recognizes the uniquely attenuated implications of state monies spent on insurance. *See* Syl. Pt. 2, *Pittsburgh Elevator Co.*, 172 W. Va. 743, 310 S.E.2d 675. Even if the majority wishes to turn a blind eye to *Pittsburgh Elevator Co.*, it is currently our law and binding precedent. For my part, when considering the integrity of the public purse, I see the state monies spent on a liability insurance policy as analogous to PEIA revenue —mostly raised from state employee premiums— spent paying claims of an insured's health insurance policy. Thus, I believe that our precedent in *Pittsburgh Elevator Co.* and the unique circumstances at play here nullify any traditional dangers to the public purse that might be presented by litigation against state agencies.

PEIA's continued obstinance has trammeled upon Air Evac's due process rights. By paying Air Evac as if the statutory rate caps had not been enjoined, and then by refusing to follow the Fourth Circuit's instructions to negotiate for the reimbursement rates it desires to pay Air Evac as a normal market participant would, PEIA is essentially acting as if the *Cheatham* litigation had not occurred. *See Cheatham III*, 910 F.3d 751, 769 (4th Cir. 2018). Crucially, Air Evac was literally compelled by law to provide these services to

11

PEIA insureds, and practically forced to accept a fractional payment rate that was preempted by federal law. All the while, Air Evac was forbidden to make up the difference by balance-billing. Outside of the Legislative Claims Commission ("LCC"), our state courts are the sole forum wherein Air Evac can seek recovery of the approximately $4,000,000 balance left over from PEIA's enjoined reimbursement rate. Although relief can be sought in the LCC, the actual payment of an award from the LCC is at the discretion of the Legislature, requiring an actual budgetary appropriation of funds. Because of the discretionary nature of an LCC award payment, our state courts are the only forum which can afford a binding recovery, or at a minimum, compel PEIA to hold a hearing regarding the disputed payments. The majority's overly broad view of sovereign immunity has stripped that forum of its jurisdiction.

Our precedent barring similar claims on sovereign immunity grounds were predicated upon the claimant being a knowledgeable and willing market participant who voluntarily chose to contract with a state agency, knowing that any disputes would go before the LCC. *See* Syl. Pt. 2, *G.M. McCrossin, Inc.*, 177 W. Va. 539, 355 S.E.2d 32; *Mellon-Stuart Co.*, 178 W. Va. at 296-97, 359 S.E.2d at 129-30. However, Air Evac's provision of services to PEIA insureds were not the result of a voluntary business decision to do business with the state, and to accept the associated risks. Air Evac's inability to choose is the crux of the issue here, as it goes directly against the eponymous purpose of the ADA, deregulation. When Congress passed the ADA, it included the preemption clause

12

specifically to ensure that the states did not merely replace federal aviation regulations with their own. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378-79 (1992). Congress clearly desired to replace the previously highly regulated American aviation sector with one maximally reliant on competitive market forces that would foster efficiency, innovation, and low prices. *Id.* at 378. Here, the mandatory compulsion to do business with PEIA while fixing reimbursement and prohibiting balance-billing eliminated any hope of free-market negotiation and competition. In direct contradiction of the ADA, Air Evac was essentially made "an offer they couldn't refuse." The Fourth Circuit's command that PEIA negotiate and act as a market participant sought to realize the goals of the ADA, as anything less contravenes the ADA's broad sweep. *See Cheatham III*, 910 F.3d at 762.[3]

Air Evac's legal compulsion to provide its services to PEIA insureds, and thus do business with the agency, makes its situation more akin to a taking, implicating its due process rights under both the federal and state constitutions. *See* U.S. CONST. amend. XIV, § 1; W. VA. CONST. art. III, §§ 9, 10, 17. Air Evac has a due process property interest in reimbursement for the services at issue. Although this Court's precedent has in the past found that a medical service provider did not have a due process property interest in

---

[3] Given the wide-reaching preemption of states acting with the force of law in a way that has a "significant effect" upon an air ambulance company's prices, it is probable that PEIA's post-*Cheatham* refusal to negotiate with Air Evac itself violated the ADA. *See Cheatham III*, 910 F.3d at 767. This is because the four-million-dollar shortfall caused by PEIA's recalcitrance likely had a prohibited "significant effect" upon Air Evac's bottom line, and thus its prices.

reimbursement for services provided, that decision was made because the payments were the subject of a health care fraud investigation. *Burgess v. W. Virginia Dep't of Hum. Servs.*, No. 23-ICA-11, 2024 WL 2952975, at *11 (W. Va. Ct. App. June 12, 2024). Outside of that unique context, federal courts have long recognized a medical services provider's due process property interest in reimbursement for already-provided services, akin to the payments at issue here. *See Pressley Ridge Sch., Inc. v. Stottlemyer*, 947 F. Supp. 929, 940 (S.D.W. Va. 1996). Thus, the majority's decision that our state courts do not have jurisdiction to hear this case based on sovereign immunity is violative of Air Evac's state and federal due process rights.[4]

In earlier cases when faced with the apparent irreconcilability of Article VI sovereign immunity with other constitutional provisions, our courts have found ways to ensure that those wronged by the state government had a remedy. *See G.M. McCrossin, Inc.*, 177 W. Va. at 542, 355 S.E.2d at 35. Air Evac's case is precisely the type of case that should be construed as a mandamus action to satisfy its due process rights by ensuring that they have some remedy for the alleged state wrongdoing. As described above, the remedy Air Evac seeks is an order compelling PEIA to follow the procedures laid out by its own statutory contested case rules:

> Any party who demands a hearing to have determined any
> constitutional rights, legal rights, duties interests or privileges

---

[4] Although the majority would likely still allow Air Evac to have the LCC as an avenue to seek recovery for the disputed payments, fundamentally because of the discretionary nature of the payment of an LCC award, I do not believe that such a forum satisfies Air Evac's due process rights.

14

of specific parties as required by law shall specify in writing the grounds relied upon as a basis for the relief requested….When the executive secretary is presented with a demand for a hearing, the executive secretary shall conduct a hearing or cause a hearing to be conducted within forty-five (45) days of receipt of such written demand, unless postponed to a later date pursuant to these rules.

W. Va. Code R. §§ 151-3-4.1, 151-3-4.2. Our precedent has held that sovereign immunity is no bar to mandamus actions to compel a state officer, who has acted arbitrarily, capriciously, or outside the law, to perform his lawful duties. Syl. Pt. 1, *State ex rel. Ritchie v. Triplett*, 160 W. Va. 599, 236 S.E.2d 474 (1977). Here, Air Evac is attempting to compel the state officers who administer PEIA to perform their lawfully required duty to hold a contested case hearing pursuant to West Virginia Code of Regulations §§ 151-3-4.1, 151-3-4.2, neatly echoing the kind of mandamus actions not barred by our sovereign immunity doctrine.

"Mandamus will lie against a State official to adjust prospectively his or her conduct to bring it into compliance with any statutory or constitutional standard." Syl. Pt. 2, *Gribben v. Kirk*, 195 W. Va. 488, 466 S.E.2d 147 (1995). Sovereign immunity bars retroactive monetary relief but does not bar an award which is prospective in nature. *Skaff v. Pridemore*, 200 W. Va. 700, 706, 490 S.E.2d 787, 793 (1997). Concerning whether Air Evac's claims should be considered retroactive or prospective, were they to be considered a mandamus action, I believe the majority to be incorrect in concluding that October 19, 2019, the date Air Evac initiated its request for a contested hearing, draws the line for prospective relief. The majority correctly notes our rule that "[t]he crucial date for drawing

15

a line between prospective and retroactive relief should be the initiation of the relevant mandamus action and not the date of judgment." Syl. Pt. 3, *Gribben*, 195 W. Va. 488, 466 S.E.2d 147. However, drawing the line demarcating prospective from retrospective relief is a practical, equity-focused exercise, tied to the particulars of each case. *See Black v. State Consol. Pub. Ret. Bd.*, 202 W. Va. 511, 522, 505 S.E.2d 430, 441 (1998) (noting that the prospective relief demarcation line was drawn at the initiation of the mandamus action simply to avoid limiting relief based on an indeterminate litigation timeline). In *Black*, the court set the prospective relief demarcation line at the appellant's first request for an administrative appeal hearing on the equitable basis that "administrative agencies cannot with impunity contravene their own policies and rules … without the availability of a remedy to, as much as possible, make the innocent party whole." *Id.* at 522, 505 S.E.2d at 441. Similarly, I believe that administrative agencies should not with impunity contravene a federal injunction without the availability of a remedy.

In demarcating prospective relief at the onset of this litigation, the majority fails to consider the practical effects of the bifurcated nature of this litigation. Air Evac could not have possibly initiated any type of relevant action to demarcate its relief as prospective until the federal courts had already held the rate capping statutory scheme to be preempted by the ADA. Before the federal preemption in the *Cheatham* litigation, what would Air Evac's cause of action be? Such an action would most likely have been soundly trounced at the pleading stage. *See* W. Va. R. Civ. P. 12(b)(6). In such a case, filing the federal action to have the rate caps enjoined should be considered the "relevant mandamus

16

action." This result would better accord with the equitable purposes underpinning *Black*'s reasoning, that a remedy should be available when an administrative agency blatantly contravenes a federal injunction.

Since the *Cheatham* litigation, Air Evac has troublingly become something of a white whale to the State of West Virginia's Ahab, as the state has made repeated efforts to regulate Air Evac despite the ADA's broad preemption.[5] Mere months after the *Cheatham* litigation ended, the West Virginia Offices of the Insurance Commissioner ("OIC") sought to bring Air Evac under its regulatory control by considering its membership program an unauthorized insurance plan. *Air Evac EMS, Inc. v. Dodrill*, 523 F. Supp. 3d 859, 863-64, 870 (S.D.W. Va. 2021), *aff'd sub nom. Air Evac EMS, Inc. v.*

---

[5] PEIA's efforts have been an attempt to use sovereign power to place its serious financial concerns onto the back of Air Evac instead of addressing them like a normal market participant. Healthcare's recently skyrocketing costs are no secret, and PEIA is no exception to this issue. *See* Sean O'Leary, *What is the Plan for the $376 Million PEIA Shortfall?*, W. VA. CTR. BUDGET & POL'Y. (Dec. 21, 2022), https://wvpolicy.org/what-is-the-plan-for-the-376-million-peia-shortfall/. Like any insurance company facing financial hardship, PEIA has cut costs; its premiums and state appropriations have increased as coverage has decreased. *See* Steven Allen Adams, *West Virginia PEIA board approves plan changes due to legislation*, WVNEWS (Mar. 30, 2023), https://www.wvnews.com/news/wvnews/west-virginia-peia-board-approves-plan-changes-due-to-legislation/article_637ca72c-cf42-11ed-aef2-a3e40da15360.html#:~:text=The%20Public%20Employees%20Insurance%20Agency%20Finance%20Board%20met,for%20out-of-state%20medical%20care%20for%20non-contiguous%20out-of-state%20counties; Phil Kabler, *PEIA: Benefit cuts of $40 million needed next year*, CHARLESTON-GAZETTE MAIL (Oct. 27, 2017), https://www.wvgazettemail.com/news/politics/peia-benefit-cuts-of-40-million-needed-next-year/article_9f9a3162-a773-57b5-b08a-8ce732f75a00.html. One can view PEIA's efforts to regulate Air Evac and as one among its many cost-cutting measures, but one only available to an insurance company wielding the state's coercive power.

*McVey*, 37 F.4th 89 (4th Cir. 2022) ("*Dodrill I*"). After the OIC's regulatory effort was enjoined, the Legislature statutorily designated Air Evac as an insurance provider. *Air Evac EMS., Inc. v. Dodrill*, 548 F. Supp. 3d 580, 585-87 (S.D.W. Va. 2021) ("*Dodrill II*"). Unsurprisingly, the district court found the *Dodrill II* legislation to be preempted by the ADA. *Id.* at 595. Apparently undeterred by the result of *Dodrill II*, the Legislature enacted another law attempting to regulate Air Evac as an insurance company. *Air Evac EMS, Inc. v. McVey*, No. 2:21-cv-00105, 2024 WL 1287634, at *2 (S.D.W. Va. Mar. 26, 2024). The state's efforts are concerningly targeted at Air Evac, as *Dodrill I* reveals that the OIC told one of Air Evac's competitors that he was looking for ways he could "shut down" Air Evac's membership program, and the legislation in *McVey* would have solely affected Air Evac. *See Id.*; *Dodrill I*, 523 F. Supp. 3d at 869. The state's attempts to regulate Air Evac show a disregard for the ADA and free market principles, as it seems that the state has committed its coercive power and resources to pushing Air Evac out of the air ambulance market.

From Air Evac's perspective, PEIA has essentially nullified the results of the *Cheatham* litigation. PEIA ignored the federal injunction against its rate caps when it refused to pay anything more, foisting a preempted lower reimbursement rate upon a health care provider who was forced to do business with the agency. Even after the *Cheatham* litigation, PEIA ignored the Fourth Circuit's instructions to act as a normal market participant by refusing to entertain any negotiations with Air Evac regarding the disputed payments. Now, by ruling that Air Evac's claims are barred by Article VI, § 35's sovereign

18

immunity, the majority would place PEIA outside of any meaningful possibility of review, giving this Court's blessing to PEIA's efforts to pretend that the *Cheatham* litigation had never occurred. In doing so, the majority has ignored the crucial facts that make this case uniquely threatening to Air Evac's due process rights and benign to the public purse, and failed to follow our wise history of allowing for relief to be found in such unique situations.

For the foregoing reasons, I believe that this Court should affirm and remand the circuit court's December 16, 2022, Final Order Granting, in Part and Denying, in Part Air Evac EMS, Inc.'s Petition for Appeal to the circuit court for further proceedings consistent with this opinion. Accordingly, I respectfully dissent.